UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

CHERYLYNNE E. ALTMAN, as the beneficiary of Dr. Kevin C. Altman and as Personal Representative of the Estate of Dr. Kevin C. Altman, deceased,

    Plaintiff,

v

UM HEALTH, a Michigan non-profit corporation; METROPOLITAN HOSPITAL, a Michigan non-profit corporation; and METRO HEALTH HOSPITAL EMPLOYEEE BENEFIT PLAN, an employee welfare benefit plan.

    Defendants.

CASE NO:

---

Todd R. Dickinson
FISHER & DICKINSON P.C.
Attorney for Plaintiff
678 Front Ave. NW, Ste 360
Grand Rapids, MI 49504
(616) 575-5655
trd@fisher-dickinson.com

---

## COMPLAINT

Plaintiff Cherylynne E. Altman, the beneficiary of her deceased husband, Dr. Kevin C. Altman, by her undersigned counsel, says:

## PARTIES

1. The Plaintiff is Ms. Cherylynne E. Altman ("Ms. Altman"), an individual resident of Kent County, Michigan.

2. Ms. Altman is the surviving spouse of Dr. Kevin C. Altman ("Dr. Altman"), a deceased individual formerly residing in Kent County, Michigan.

3. Defendant UM Health is the surviving Michigan non-profit corporation following a merger with the Metropolitan Health Corporation, which became effective in November of 2020. Defendant UM Health does business or formerly did business as Metro Health – University of Michigan Health.

4. Defendant Metropolitan Hospital, a Michigan non-profit corporation, is an extant business entity also doing business as Metro Health – University of Michigan Health.

5. Upon information and belief, Defendants UM Health and Metropolitan Hospital are affiliated corporate entities. (For the purpose of this Complaint, the term "Metro Health" shall refer jointly and severally to both Defendants.)

6. At all times during Dr. Altman's life, Defendant Metropolitan Hospital was the plan sponsor and plan administrator of various employee health and welfare benefit plans, including (but not limited to) a group term life insurance policy available as a part of the Defendant Metro Health Hospital Employee Benefit Plan (the "Plan").

7. The Plan is an "employee welfare benefit plan" within the meaning of and as subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. 1001 *et seq*.

8. Metro Health is a "fiduciary" of the Plan within the meaning of 29 U.S.C. 1002(21).

9. Dr. Altman, a clinical neurologist, was an employee of Metro Health (or its predecessors) beginning in 2008. Dr. Altman practiced medicine for the benefit of Metro Health's patients.

10. While an employee of Metro Health, Dr. Altman was a participant in various employee health and welfare benefit plans offered by his employer, including (but not limited to) the Plan.

11. While an employee of Metro Health, Dr. Altman was a participant in a group term life insurance policy available as a part of the Plan.

## JURISDICTION AND VENUE

12. Plaintiff asserts concurrent federal jurisdiction pursuant to 29 U.S.C. 1132(e) and 28 U.S.C. 1331.

13. Plaintiff also asserts subject matter jurisdiction in this Court pursuant to 28 U.S.C. 1367(a) because certain state law claims asserted in this lawsuit form part of the same case or controversy as Plaintiff's claim which are under exclusive jurisdiction of this Court.

14. Venue is proper in the Western District of Michigan because the Plan is administered in this district, because the Plan's address of record is in this district, because Defendant Metropolitan Hospital is headquartered and does business in this district, because Defendant UM Health does business in this district, and because a substantial part of the events and omissions giving rise to the claims brought herein occurred in this district.

## FACTUAL BACKGROUND

15. Dr. Altman was hired by Metro Health during or around January of 2008. He served Metro Health as a practicing physician in the specialty of neurology.

16. Dr. Altman's employment at the time of his hire was governed by the terms of an Employment Agreement he executed with Metro Health. A copy of the 2008-2010 Agreement is attached as **Exhibit A**.

17. The 2008-2010 Agreement contained a durational term lasting between January 1, 2008 and June 30, 2010 and renewable upon one-year terms thereafter pending notice between the parties. (**Ex. A** at 3, Sec. 8).

18. The 2008-2010 Agreement defined many of the terms and conditions of Dr. Altman's employment, including the compensation and benefits to which he was entitled as compensation for providing his services as a physician to the hospital. (**Ex. A** at 3-6, Sec. 9-11).

3

19. Section 11 of the 2008-2010 Agreement provided that Dr. Altman "shall be entitled during the Employment Term to receive" certain enumerated insurance benefits. Section 11(a) provided that Metro Health "shall provide [Dr. Altman] with" certain "insurance coverages." Section 11(a)(iv) further provided that Metro Health "will provide [Dr. Altman] with group life term insurance, in an amount equal to two times [Dr. Altman's] Annual Salary provided [Dr. Altman] qualifies for participation under [Metro Health's] group policy." (**Ex. A** at 4-5, Sec. 11).

20. Dr. Altman qualified for participation under Metro Health's group life term insurance policy (as provided by the Plan or otherwise).

21. During or around September of 2016, Dr. Altman was diagnosed with myelogenous leukemia. Myelogenous leukemia is a relatively uncommon form of blood-cell cancer which viciously attacks the bone marrow.

22. Shortly after receiving his diagnosis, Dr. Altman requested leave from Metro Health pursuant to the Family and Medical Leave Act ("FMLA"). Dr. Altman was eligible to take FMLA leave at the time he requested it. Metro Health granted his request for leave.

23. On December 22, 2016, Metro Health informed Dr. Altman that he had exhausted his eligibility for FMLA leave effective December 19, 2016. In the same correspondence, Metro Health informed Dr. Altman that his benefits with Metro Health would be terminated effective January 19, 2017.

24. On December 29, 2016, Dr. Altman applied for a period of non-FMLA medical leave while he awaited a bone marrow transplant effective retroactively to December 20, 2016. As required by Metro Health, he attached his attending physician's statement, which provided that Dr. Altman was then unable to work, but that he would likely be able to work again beginning "December 31, 2017."

4

25. On February 17, 2017, Dr. Altman endured an allogenic stem cell transplant. Dr. Altman's recuperation process was frequently painful and lasted for more than a year.

26. On April 26, 2018, Dr. Altman's treating physician determined he was ready to return to work with certain limited restrictions effective May 14, 2018 and wrote Dr. Altman a letter memorializing this opinion. Dr. Altman provided Metro Health with a copy of his return to work notice the same day, and he informed Metro Health that he intended to return to work as soon as possible.

27. On May 8, 2018, a representative of Metro Health informed Dr. Altman that their human resources department had not yet assigned him a starting date.

28. But later that same week, Dr. Altman learned that he would not be permitted by Metro Health to resume work on the date defined by his physician. Instead, despite receiving clearance from Dr. Altman's treating physician, Metro Health informed Dr. Altman that he could return to work only upon completion of an evaluation of his competency.

29. Dr. Altman's practice of medicine had been interrupted for only nineteen months at the time Metro Health questioned his competency to return to work.

30. On or near Dr. Altman's return to work date, Metro Health directed Dr. Altman to travel to San Diego, California and be subjected to a competency evaluation performed by the Physician Assessment and Clinical Education ("PACE") Program, affiliated with or operated by the University of California – San Diego School of Medicine.

31. Metro Health informed Dr. Altman that they would be following up with him soon to provide information about scheduling his evaluation with the PACE Program.

32. In 2010, the Wall Street Journal published an article which explained that the PACE Program was not just for "troubled doctor," and stated, "The primary mission of PACE is to

5

evaluate the competence of doctors whose infractions range from serious medical error and negligence to sloppy record keeping and anger management.".

33. At no time during Dr. Altman's history of practice as a physician had he committed a serious medical error, committed medical negligence, engaged in "sloppy" record-keeping, or exhibited problems with anger management.

34. Nevertheless, on May 16, 2018, Metro Health sent Dr. Altman an application he was required to submit to the PACE Program to receive the evaluation. The application included multiple forms and required Dr. Altman to submit his medical records from the past two years. Dr. Altman submitted the forms on May 20, 2018.

35. But Metro Health did not provide Dr. Altman with any idea of when his competency evaluation would be performed during the month of May.

36. On May 18, 2018 and with return to work date in sight, Dr. Altman converted his group term life insurance policy into a portable voluntary term life insurance policy administered through Cigna.

37. On June 18, 2018, Dr. William A. Norcross, Director of the PACE Program, called Dr. Altman and asked him to provide a scope of practice letter explaining the kind of medicine he practiced. Dr. Altman provided the form the next day.

38. On or before June 19, 2018, Metro Health sent Dr. Altman a new draft employment agreement. A copy of the Proposed Agreement is attached as **Exhibit B**.

39. The Proposed Agreement offered materially similar compensation and benefits to Dr. Altman as the 2008-2010 Agreement, including Metro Health's promise to provide him with "group term life insurance, in an amount equal to three times [Dr. Altman's] annual salary" at the onset of his "Employment Term." (Ex. B at 4-5 and 16, Sec. 10(c) and internal Exhibit C(a)(iv)).

40. But the Proposed Agreement also provided that the "Employment Term" would not begin until the following conditions precedent were met:

    a.    Dr. Altman would apply for and participate in the PACE Program, and receive a "successful clearance" by the Program;

    b.    Dr. Altman would successfully complete "any applicable medical staff requirements, including but not limited to Focused Professional Practice Evaluation ('FPPE') and/or Ongoing Professional Practice Evaluation ("OPPE") processes;" and

    c.    Dr. Altman "shall respond to requests for information concerning work-related restrictions" and inform Metro Health of any such restrictions.

(Ex. B at 3, Sec 8).

41. Despite sending him the terms of the Proposed Agreement, however, Metro Health still made no effort to schedule him for evaluation with the PACE Program.

42. Upon information and belief, Dr. Altman and Metro Health mutually executed the Proposed Agreement during or around June of 2018, but not before June 19, 2018.

43. On June 29, 2018, Dr. Altman received a notice from the PACE Program informing him that he would be subject to an evaluation containing the following elements: a "physical evaluation," a "neuropsychological evaluation," "functional testing, including exercise stress testing," an "oral clinical evaluation in neurology," and a "standardized patient evaluation."

44. The PACE Program billed Dr. Altman for $13,200, payable at his "earliest convenience."

45. Worse, the June 29 notice included no details about when the procedure would be scheduled – such details would be divulged only upon receipt of payment.

46. Dr. Altman protested the PACE Program's demand for payment with Metro Health shortly after receiving the June 29 letter, as the Proposed Agreement provided that Metro Health held the obligation to pay for Dr. Altman's evaluation. (Ex. B at 3, Sec. 8(a)(1)). Metro Health agreed to remedy the situation.

47. But on July 10, 2018, the PACE Program informed Dr. Altman that no invoices had been paid by Metro Health. Dr. Altman contacted Metro Health to apprise them of their failure to pay.

48. On July 16, 2018, Dr. Altman contacted the PACE Program to inquire about whether the balance had been paid so that he could schedule his evaluations. He was informed that only one of two PACE Program invoices had been paid by Metro Health, and that scheduling could not be completed until both were paid.

49. Dr. Altman contacted Metro Health again to protest their lack of payment. They remedied the situation at some time after July 16, 2018.

50. After payment had been received, Dr. Altman again contacted the PACE Program to schedule an evaluation as soon as possible. He was informed by the PACE Program that they could only fit him in beginning on July 24, 2018. His other alternative was to wait for an appointment beginning in August.

51. On July 20, 2018, the PACE Program provided Dr. Altman with a detailed schedule for his competency evaluation, beginning July 24, 2018 and continuing on July 26 and 27.

52. Dr. Altman booked a last-minute flight to San Diego and attended his exercise stress test on July 24.

53. But when Dr. Altman returned for testing on July 26, the PACE Program was not prepared to evaluate him in a manner consistent with the schedule it had provided to him. Instead, Dr. Altman's appointments were rapidly rearranged, and the PACE Program decided "on the fly" to cancel his cognitive screening examination. One rescheduled appointment required him to meet a physician for an oral clinical evaluation beginning at 7:00 A.M.

54. Dr. Altman completed all tests as rescheduled before returning to Grand Rapids.

8

55. But neither Dr. Altman nor Metro Health received the results of Dr. Altman's evaluations in July of 2018.

56. Neither Dr. Altman nor Metro Health received the results of Dr. Altman's evaluations in August of 2018.  When Dr. Altman called the PACE Program to inquire about completion of the process on August 24, 2018, he was told the report had not been completed.

57. Neither Dr. Altman nor Metro Health received the results of Dr. Altman's evaluations in the first two weeks of September of 2018.  When Dr. Altman called the PACE Program to inquire about the completion of the process on September 13, 2018, he was informed that the report was incomplete but would be disbursed to Metro Health the next day.

58. Nevertheless, the PACE Program disbursed a report of Dr. Altman's competency to Metro Health at some point subsequent to September 13, 2018.  This report was inexplicably dated September 12, 2018.

59. The PACE Program ultimately evaluated Dr. Altman's performance by issuing a "Pass – Category 1" (the highest rating), and declared Dr. Altman "FIT FOR DUTY."

60. On September 17, 2018, Dr. Altman went in for a routine biopsy screening to check the status of his leukemia's remission.

61. The same day, Metro Health informed Dr. Altman that he had passed the PACE Program's evaluation and provided him with the news that he was to be considered fit for duty.

62. The same day, Dr. Altman's physician informed Dr. Altman that his cancer had returned.

63. Dr. Altman was hospitalized on September 19, 2018.  He sent a letter to Dr. Norcross, the PACE Program's Director, on the same day, complaining about the delays and problems he had experienced leading up to and during his evaluation with the program.

64. On October 2, 2018, Metro Health provided Dr. Altman with a non-FMLA Leave of Absence pending between September 20, 2018 and September 20, 2019.  Despite this, Metro Health has subsequently confirmed that Dr. Altman was considered an active employee at this time.

65. On November 19, 2018, Dr. Norcross responded to Dr. Altman's September 19 letter.  He wrote to Dr. Altman:

> Last week I had the opportunity to sit down with our Associate Director and the Administrative Director of our Fitness for Duty Program to review the events described in your letter…  I am told it was initially thought that your hospital would be our client, but your hospital declined to sign the contract, thereby making you our client.

66. In the same letter, Dr. Norcross wrote:

> [A]gain, I am told that there was some confusion regarding who would pay:  you, your hospital, or some shared arrangement…  There was a misunderstanding on our end regarding the scheduling of your evaluation, and we ask your forgiveness for this.  I will say after the mortification had passed, our staff and faculty did a good job of putting your evaluation together…

67. In the same letter, Dr. Norcross wrote:

> One of your concerns was that the neuropsychological examination was scheduled from 9 AM to 4 PM, yet you were able to leave at 12:15 PM.  That was because your performance was so outstanding!

68. In the same letter, Dr. Norcross wrote:

> You express concern that it took 7 weeks for us to complete the written report, and that it should have been done in much less time.  While you are correct, the 7 week wait you experienced is not too far off our average…

69. In the same letter, Dr. Norcross wrote:

> Toward the end of your letter, you describe your unhappiness with being referred to the PACE Fitness for Duty Program at all.  Surely you must know that we had absolutely nothing to do with the decision to bring you here…

70. In the same letter, Dr. Norcross wrote:

> I thank you for your honest and heartfelt feedback, and I apologize for any delay or undue discomfort we may have caused you. On the other hand, I hope you take some satisfaction in the knowledge that you passed our examination with a globally outstanding performance.

71. But Dr. Altman took no satisfaction in the knowledge that he passed the examination.

72. That is because Dr. Altman never received Dr. Norcross's letter.

73. That is because Dr. Altman passed away on November 2, 2018 from his leukemia.

## COUNT I -
## CLAIM FOR RELIEF UNDER ERISA SEC. 502(A)(1)(B)
## AGAINST ALL DEFENDANTS

74. Plaintiff repeats and reasserts the allegations set forth above as if fully set forth herein.

75. ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary of a plan to bring a civil action to recover benefits due under the terms of the plan, to enforce her rights under the terms of the plan, and to clarify her rights to future benefits under the plan.

76. Plaintiff is entitled to life insurance benefits under the terms of the Plan.

77. Defendants UM Health, Metropolitan Hospital, and the Plan denied such benefits in violation of the terms of the Plan.

78. All then-effective Plan Documents were the operative plan documents of the Plan at the time of, and in connection with, Dr. Altman's death and Plaintiff's right to life insurance benefits under the Plan.

79. Defendants disregarded the then-effective Plan Documents in denying Plaintiff's claim for benefits.

80. Pursuit of any administrative remedy on the part of Plaintiff against any Defendant would be futile.

81. Plaintiff is entitled to life insurance benefits under the Plan, as pleaded herein, and Defendants' denial of the same was unlawful, violative of the Plan, and arbitrary and capricious.

## COUNT II -
## CLAIM FOR OTHER APPROPRIATE RELIEF UNDER ERISA SEC. 510 AGAINST DEFENDANTS UM HEALTH AND METROPOLITAN HOSPITAL

82. Plaintiff repeats and reasserts the allegations set forth above as if fully set forth herein.

83. ERISA Sec. 510 provides that "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant and beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan… or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan[.]"

84. Dr. Altman was a participant in Defendant Plan, and an employee of Defendant UM Health or Defendant Metropolitan Hospital, or both.

85. Defendants UM Health and Metropolitan Hospital knowingly, repeatedly, arbitrarily, and capriciously delayed Dr. Altman's new return-to-work date for the purpose of interfering with his ability to receive rights to which he may have become entitled under the Plan as an active employee of the Defendants or to which Plaintiff may have become entitled under the Plan as a beneficiary of a participant.

86. Defendants UM Health and Metropolitan Hospital intentionally delayed Dr. Altman's return-to-work date for the purpose of interfering with his and Plaintiff's attainment of benefits under the Plan.

87. Defendants UM Health and Metropolitan Hospital deliberately discriminated against Dr. Altman for the purpose of interfering with his and Plaintiff's rights under the Plan.

88. Defendants UM Health and Metropolitan Hospital engaged in the above-described conduct after Dr. Altman was qualified to return to work.

## COUNT III -
## CLAIM FOR OTHER APPROPRIATE RELIEF UNDER ERISA SEC. 502(A)(3) AGAINST ALL DEFENDANTS

89. Plaintiff repeats and reasserts the allegations set forth above as if fully set forth herein.

90. ERISA Section 502(a)(3) empowers a plan participant or beneficiary to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C.§ 1132(a)(3).

91. Defendants UM Health and Metropolitan Hospital repeatedly and knowingly delayed taking all affirmative steps to allow Dr. Altman to return to work after he received his fitness for duty notification from his doctor.

92. In so doing, Defendants UM Health and Metropolitan Hospital engaged in unlawful breach of their fiduciary duties to administer the Plan in accordance with ERISA.

93. As a beneficiary of the Plan, the Plaintiff is entitled to equitable relief under ERISA Sec. 502(a)(3), requiring Defendants to pay restitution in the form of a surcharge or otherwise credit Plaintiff for all ERISA benefits to which they are retroactively entitled in order to be made whole and to prevent the Defendants' unjust enrichment.

## COUNT IV -
## VIOLATION OF MICHIGAN'S PERSONS WITH DISABILITIES CIVIL RIGHTS ACT, MCL 37.1201 AGAINST DEFENDANTS UM HEALTH AND METROPOLITAN HOSPITAL

94. Plaintiff repeats and reasserts the allegations set forth above as if fully set forth herein.

95. Under the Michigan Persons With Disabilities Civil Rights Act ("MPWDCRA"), an employer shall not "[d]ischarge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability or

genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position." MCL 37.1202(1)(b).

96. Under the MPWDCRA, an employer shall not "[l]imit, segregate, or classify an employee or applicant for employment in a way which deprives or tends to deprive an individual of employment opportunities or otherwise adversely affects the status of an employee because of a disability or genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position." MCL 37.1202(1)(c).

97. Under the MPWDCRA, an employer shall not "[f]ail or refuse to hire, recruit, or promote an individual on the basis of physical or mental examinations that are not directly related to the requirements of the specific job." MCL 37.1202(1)(d).

98. At all material times, Dr. Altman was employed by Defendants UM Health and Metropolitan Hospital.

99. Dr. Altman's leukemia constitutes a disability as that term is defined by and within the meaning of the MPWDCRA.

100. At the time of the adverse employment action, Dr. Altman was qualified to return to work for Defendants as a neurologist.

101. Dr. Altman was discriminated against, within the meaning of the MPWDCRA, when the Defendants failed to return him to work pending completion of a physical or mental examination that was not directly related to the requirements of his job.

102. Dr. Altman's disability was a determining factor in Defendants' decision to take an adverse employment action against Dr. Altman by refusing to allow him to return to work.

103. As a direct and proximate result of Defendants' unlawful discrimination, Dr. Altman during his life sustained injuries and damages, including the loss of earnings and earning

capacity; loss of fringe and pension benefits; mental and emotional distress; humiliation and embarrassment; loss of career opportunities; and loss of the ordinary pleasures of everyday life, including the right to seek and pursue a gainful occupation of choice.

### COUNT V -
### BREACH OF CONTRACT
### AGAINST DEFENDANTS UM HEALTH AND METROPOLITAN HOSPITAL

104. Plaintiff repeats and reasserts the allegations set forth above as if fully set forth herein.

105. Dr. Altman and Defendant UM Health and Metropolitan Hospital were parties to an employment agreement, the Proposed Agreement.

106. Pursuant to the terms of the Proposed Agreement, Dr. Altman's Employment Term was to commence after several conditions precedent were met, some of which were within Dr. Altman's control and some of which were within the Defendants' control.

107. Pending the beginning of the Employment Term, Dr. Altman would be entitled to receive certain wages and earnings and certain fringe and other benefits.

108. Dr. Altman timely and diligently fulfilled all of the conditions precedent of which he was in control immediately upon execution of the Proposed Agreement.

109. Defendants UM Health and Metropolitan Hospital intentionally, arbitrarily, and capriciously placed obstacles in the way of several conditions precedent to the commencement of the Employment Term, including (but not limited to) failing to properly register Dr. Altman for the PACE Program, failing to pay for services in the PACE Program, and otherwise failing to fulfill other obligations and conditions precedent for the commencement of the Employment Term.

110. Defendants UM Health and Metropolitan Hospital unlawfully rely on the non-performance of conditions precedent which were at all times within their sole control to deny Dr.

Altman wages and other benefits to which he otherwise would have been owed under the Agreement.

111.    Defendants' conduct as described in this Complaint constitutes a breach of the Proposed Agreement.

112.    Dr. Altman has been damaged by Defendants actions and inactions leading to the Defendants' breach of the Proposed Agreement.

## RELIEF

WHEREFORE, Plaintiff, by her attorneys Fisher & Dickinson P.C., requests this Court to enter judgment in its favor against Defendants and award an amount equal to all salary and benefit entitlements which were denied to Dr. Altman, exclusive of costs, interest, and attorney fees, and that the court grant it such other and different relief as the court deems warranted.

Respectfully submitted,

Dated:  February 1, 2022

 s/ Todd R. Dickinson
Todd R. Dickinson
FISHER & DICKINSON P.C.
Attorney for Plaintiff
678 Front Ave. NW, Ste 360
Grand Rapids, MI 49504
(616) 575-5655
trd@fisher-dickinson.com