## PHYSICIAN EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** is made between **METRO HEALTH HOSPITAL,** an assumed name of Metropolitan Hospital, Michigan nonprofit corporation, of 1919 Boston, S.E., Grand Rapids, Michigan 49506 (the "Hospital"), and **KEVIN ALTMAN, M.D.** of 115 Bridge† Street, Aliquippa, PA 15001 (the "Physician").

## RECITALS

The Hospital, a wholly owned subsidiary of Metro Health Corporation, operates a general acute care hospital in Grand Rapids, Michigan. The Hospital desires to secure the services of a physician trained as a Neurologist who will provide neurology services for patients of the Hospital.

The Physician is licensed to practice medicine in the State of Michigan (or shall be licensed when the Agreement commences) and is qualified to practice in the area of **neurology**. The Physician desires to enter into an Employment Agreement with the Hospital to provide the professional services for which the Hospital requires.

**NOW, THEREFORE,** in consideration of the promises and the mutual covenants in this Agreement, the parties agree as follows:

1.      **Employment**. The Hospital shall employ the Physician, and the Physician shall work for the Hospital upon the terms and conditions set forth in this Agreement. The Physician shall adhere to the Hospital policies and procedures including but not limited to, those noted below:

-       Corporate Compliance Program and Code of Conduct Policy
-       Disruptive Medical Staff/Practitioners - #MS-06
-       Corporate Compliance Education - #RM-21
-       Medicaid/Medicare Sanction Check - # RM-22
-       Grievance Procedure - #HR27
-       Sexual Harassment - #HR-33

All business the Physician develops and secures during the term of this Agreement shall be the Hospital's property. The Physician shall be a member of the Hospital medical staff, having achieved such status by application as provided in the Hospital Medical Staff Bylaws. This Agreement does not vest the Physician with medical staff membership.

2.      **Exclusive Agreement**. The Physician shall devote his full time and best effort for the Hospital's benefit during the Employment Agreement term. This Employment Agreement prohibits the Physician from being involved financially or otherwise with any

Exhibit A, page 1 of 17

competing business organization. Physician shall not engage, directly or indirectly, in any other medical or surgical activities unless approved by the Vice President/Chief Medical Officer. The Physician represents and warrants that he is not bound by any restrictive covenant or agreement that prevents or restricts him from performing his duties under this Agreement. The Physician agrees to indemnify and hold the Hospital harmless from any liability arising out of his breach of such covenant or agreement or the failure to disclose to the Hospital the existence of such covenant or agreement.

3. **General Duties**. P hysician s hall b e employed b y t he H ospital a s a physician specializing in **Neurology**.

The Physician shall provide such services as a neurologist to perform and/or interpret certain tests, perform neurology consultations, participate in the Hospital call schedule and other duties as are mutually agreed upon by the parties. **The Physician shall be evaluated on an annual basis as set forth in the Physician Appraisal Form attached. (Attached as Exhibit A). In general, the Physician will perform such duties** and occupy those positions as the Board of Directors of the Hospital may determine which are reasonably required, including without limitation, the treatment and diagnosis of patients **as it pertains to neurology** and the participation in such third party payment or managed care programs as the Hospital may recommend from time to time. With respect to patient treatment, Physician shall exercise his independent medical judgment **w ith respect to providing neurology services**. The H ospital shall not have the right to direct the Physician to take or omit any act which conflicts with such medical judgment. **It is understood that the Physician shall be available on an on-call basis according to a rotation schedule established by the Executive Vice President/Chief Medical Officer or Department of Neurology**. The Physician shall at all times act in a manner which furthers the Hospital's professional image, and shall take such action as may be necessary to maintain and encourage the Hospital's relationship with its patients and other` professionals. The Physician shall maintain a c urrent k nowledge o n d evelopments i n t he field o f n eurology b y attending a reasonable number of seminars or conventions each year.

4. **Fees and Billing**. The Hospital shall establish a written fee schedule and charges for all services the Physician provides pursuant to this agreement. The Hospital may amend this fee schedule and charges at any time and from time to time during the Agreement term. The Hospital or its appointed agent shall have the sole right to bill and collect from patients and third party payors (as applicable) for **neurology** services provided by the Physician hereunder. The Hospital shall be entitled to retain all proceeds of those bills. The Physician shall not bill separately for any such services.

At the Hospital's request, the Physician shall execute and deliver agreements and other documents necessary for the Hospital to bill and be reimbursed directly for the Physician's services under this Agreement. The Physician shall deliver to the Hospital or its designated or assigned agent any sums paid to the Physician (by check, in cash, or otherwise) by any patient or third party payor (Blue Cross/Blue Shield of Michigan, Medicare, Medicaid, or otherwise) for services the Physician provides pursuant to this Agreement. The Physician's obligations in this

2

Section shall continue even after this Agreement has terminated for services provided while a Hospital employee.

5. **Treatment of Patients.** Physician shall have control over patient diagnosis and treatment for patients assigned to him/her, except in such instances as other physicians are "covering." The Physician agrees that his/her patient treatment and diagnosis will be consistent with applicable Hospital bylaws, rules and regulations. Physician understands that upon failure to do so, he/she may be relieved from treating the patient.

6. **Contracting.** Physician shall not enter into contracts binding upon Employer without Employer's express approval.

7. **Qualifications.** During the term of this Agreement, the Physician shall: (i) maintain a permanent, unrestricted license to practice medicine in Michigan; (ii) be licensed and registered as necessary to dispense all narcotics and other drugs required to be dispensed in connection with the provision of physician services under this Agreement; (iii) maintain in good standing such medical staff membership and privileges at the Hospital as shall be necessary to be able to perform the services required hereunder; (iv) participate in regular medical staff activities and responsibilities at the Hospital, including attendance at required meetings; and (v) participate fully in all third party payment which the hospital accepts; and (vi) be board certified or in the process of completing his/her board certification within the initial 12 month employment term.

8. **Employment Term.** The Physician's term of employment by the Hospital (the "Employment Term") shall commence **January 1, 2008** and terminate **June 30, 2010** (subject to earlier termination pursuant to **Section 11 below**). At the end of the initial employment term, the renewal employment term shall be July 1st to June 30th. The Agreement renews **automatically** for additional one (1) periods unless either party gives written notice to the other of their intention not to renew at least ninety days (90) prior to the expiration of the initial employment term or any renewal term. This Agreement may be renegotiated each year after the initial employment term at either party's request. In the event the parties are unable to reach mutual agreement on compensation for an additional or renewal period, either party may terminate this agreement by written notice, effective not less than ninety days (90) after the date of such notice.

9. **Compensation.**

(a) **Annual Salary.** The Hospital shall pay the Physician a base salary of **Two Hundred Thirty Thousand Dollars ($230,000.00)** per year "Annual Salary" plus any incentive earned, as set forth in the Compensation Model attached as **Exhibit B** for the initial Eighteen (18) months of this Agreement for all clinical duties. Subsequent years beginning June 30, 2009, shall be based on production and incentive compensation as set forth in Exhibit B.) The Hospital may amend the compensation model at the beginning of every fiscal year (July 1-June 30). The Physician's salary

3

shall be payable in accordance with the normal payroll practices of the Hospital. **The Physician will be evaluated each year, at the same time as other salaried staff, by the physician's immediate supervisor based on a favorable evaluation and recognizing budgetary constraints and a performance evaluation as set forth in the Physician Appraisal Form. (Attached as Exhibit A).**

(b)     **Expenses**.  The Hospital shall reimburse the Physician for all **prior approved expenses** incurred for attending professional CME conferences appropriate to their specialty, in an amount not to exceed **$3,000.00** per contract year. All CME expenses will be reimbursed following the "Reimbursement for Travel and Business Expense" policy (FIN-01). The Hospital shall also reimburse the Physician for professional organizational dues/fees as required or related to the physician's services provided under this Agreement in an amount not to exceed **$1,700.00**. Of this amount, Hospital medical staff dues is reserved and the following apply:

(i)      CME is based on budget year and is not transferable to the following year.

(ii)     Any additional CME above **$3,000.00** or professional dues/fees above **$1,700.00** will need approval of the Vice President/Chief Medical Officer.

(iii)    State License Fees and DEA fees necessary for Physician to provide their contracted duties shall be the responsibility of the Physician.

(iv)    The Physician shall be a member of the American Osteopathic Association (AOA) or American Medical Association (AMA) **or appropriate specialty society**, as applicable.

10.     **Sign-On Bonus**.  Upon execution of this Agreement, the Physician shall be paid a one-time sign-on bonus in the amount of Twenty Thousand Dollars ($20,000). Physician understands and agrees that in the event he fails to commence employment with the Hospital as required by this Agreement or elects to terminate employment with the Hospital at any time during the initial employment term of the agreement, he will be expected to repay the sign-on bonus on a pro rata basis in accordance with the terms of a Promissory Note which the physician shall sign at the time the sign-on bonus is disbursed.

11.     **Additional Benefits**.  In addition to the compensation described in **Section 9**, the Physician shall be entitled during the Employment Term to receive the following additional benefits:

(a)     **Insurance**.  The Hospital shall provide the Physician with the following insurance coverages:

4

(i) **Professional Liability Insurance**. The Hospital will provide professional liability insurance to the Physician from its self-insurance plan with limits of $3,000,000/$6,000,000 and any excess policy in effect at such time. The Hospital may change the self-insurance plan and/or any excess insurance, including its limits, at any time as determined by the Hospital. Such insurance will cover Physician's services under this Agreement. The Hospital shall maintain appropriate "tail" insurance coverage through its self-insurance plan in the event the Physician's employment terminates for any reason.

The Hospital and Physician each agree to promptly notify the other of claims or incidents, which may result in claims. Physician agrees to fully co-operate with the Hospital in investigating any such claim or incident. The Hospital shall have the right to settle any claim or suit without the Physician's consent. The Hospital shall notify the Physician of any settlements.

(ii) **Health and Dental Insurance**. The Hospital will provide the Physician and any dependents with the health and dental insurance the Hospital provides to other Hospital employees. Physician must make the appropriate required contribution toward the insurance, provided the Physician qualifies for coverage under such plan.

(iii) **Long Term Disability Insurance**. The Hospital will provide the Physician with long term disability insurance under the Hospital's group disability insurance plan in effect, provided the Physician qualifies for coverage under such plan.

(iv) **Life Insurance**. The Hospital will provide the Physician with group term life insurance, in an amount equal to two times the Physician's Annual Salary provided the Physician qualifies for participation under the Hospital's group policy.

(v) **Salary Continuation Plan**. (See Salaried Employee Sick Pay policy HR-69 and Leave of Absence policy HR-62)

(b) **Paid Time Off /CME Leave (PTO)**. (Referred to in "Paid Time Off" policy" HR-67) The Physician will receive a total of **twenty-three (23)** days paid for PTO leave for each 12-month employment period. Based on FTE status the Physician will be paid for six (6) holidays (New Year's Day, Memorial Day, July 4th, Labor Day, Thanksgiving and Christmas). The Physician must request PTO at least thirty days (30) in advance of the date PTO is to begin and will be at the discretion of the Vice President/Chief Medical Officer.

5

Prorated based on FTE status the Physician shall receive an additional three (3) days of PTO at 3 years of employment and five (5) days of PTO at 10 years of employment.

PTO leave must be taken during the 12-month employment period earned. It may not be carried forward to a new 12-month employment period. If the Physician's employment is terminated consistent with Paragraph 11 (a), (i), (ii), or (iii), the Physician shall not be paid for any unused PTO leave time. If the Physician is terminated or leaves for any other reason, then the Hospital shall prorate the PTO leave time to date of termination/leave, deduct any PTO leave time already used in the 12-month employment period, and then pay out any difference to the Physician.

(c)  **Retirement Plan(s)**.  The Physician shall be entitled to participate in the Hospital's retirement plan under the terms and conditions of such plan.

12.  **Termination of Employment**.  Notwithstanding that the Employment Term or any Renewal Term has not expired, this Agreement may be terminated in accordance with the following:

(a)  **Hospital Termination**.  The Hospital shall have the right to terminate this Agreement immediately under any one or more of the following circumstances, in which event no compensation or additional benefits shall be owed following the termination effective date:

(i)  **Breach**.  Physician's breach of any Agreement term(s) if the Physician does not correct the breach within thirty days (30) after the Hospital gives the Physician written notice.

(ii)  **Criminal Activity**.  The Physician is convicted of any felony involving moral turpitude.

(iii)  **Professional Standing**.  The Physician ceases to be a member in good standing of the Hospital's medical staff for any reason, including an adverse recommendation for disciplinary action by any medical staff committee, or by the governing body, or if his/her license to practice medicine or to dispense narcotics or controlled substances is suspended, denied, limited or revoked for any reason.

(iv)  **Death**.  Upon the Physician's death.

(v)  **Disability**.  Physician's inability to provide professional medical services on a full-time basis due to disability resulting from injury, sickness, disease, or other cause if such disability continues for a period of three (3) consecutive months, and if the Physician's attending physician and the Hospital's physician confirm the disability to be of a long term nature expected to continue

6

for at least 12 months from onset for which there is no possible reasonable accommodation. If the two physicians cannot agree, those physicians shall choose a third physician whose decision shall be binding on all parties.

(b)   **Physician Termination.** The Physician shall have the right to terminate this Agreement immediately under any one or more of the following circumstances:

(i)   **Hospital Licensure.** If at any time the Hospital loses its license to operate as a hospital.

(ii)   **Breach.** Hospital breaches any term(s) of this Agreement where such breach is not corrected within thirty days (30) after Physician provides written notice.

(c)   **Termination by Mutual Consent.** The parties can terminate this Agreement before the expiration of any term by mutual written consent. Provided, however, the parties agree that if this Agreement is terminated prior to the end of the 1st twelve months of the term, the parties shall not enter into another agreement for the provision of the same or substantially similar services during the first twelve months of the term. Provided, however, the parties agree that if this Agreement is terminated prior to the end of the 1st twelve months of the term, the parties shall not enter into another agreement for the provision of the same or substantially similar services during the first twelve months of the term.

(d)   **Termination by Either Party.** Either party may terminate this Agreement for any reason at any time on ninety days (90) prior written notice to the other. Provided, however, the parties agree that if this Agreement is terminated prior to the end of the 1st twelve months of the term, the parties shall not enter into another agreement for the provision of the same or substantially similar services during the first twelve months of the term.

13.   **Duty of Physician Upon Termination.** The Physician shall, upon Agreement termination, return to the Hospital all the Hospital's records of any sort, including patient medical records, and all literature, supplies, letters, written or printed forms, and/or memoranda pertaining to the Hospital's business within forty-eight (48) hours of such termination and without Hospital demand. In addition, the Physician shall have a continuing obligation to co-operate with the Hospital with respect to malpractice and other litigation regarding the services provided pursuant to this Agreement.

14.   **Non-competition.** Commencing on the date of this Agreement and continuing for **twenty-four (24) months** after Agreement termination (the "Non-compete Period"), the Physician shall not, whether for his/her own account or for any other person or organization, directly or indirectly, participate in, administer or provide medical services similar to those provided under this Agreement, or engage with another hospital at any **location within a five**

7

(5) mile radius of any Metro Health practice site and a ten (10) mile radius from the Physician's practice site. During the Non-compete Period the Physician shall not solicit, either directly or indirectly, to provide medical services to any past or present patient who received services at the site at which the Physician practiced medicine, announce the opening of Physician's new practice to persons residing in the restricted area, request any patient who received services at such site to terminate his/her relationship with such practice, or induce, or attempt to influence, any practice employee to terminate his/her relationship with Hospital, or its affiliate. The parties acknowledge that the geographic and practice restrictions under this section and the period of such restrictions area reasonable and necessary and that any breach of the provisions of this section is likely to result in irreparable injury to the Hospital. The parties also acknowledge that any other remedy at law alone will be an inadequate remedy for such breach, and that in addition to any other remedy it may have, the Hospital shall be entitled to specific performance from the Physician under this Agreement and to seek both temporary and permanent injunctive relief (to the extent permitted by law) without the necessity of proving actual damages. The Hospital may agree, in its sole exclusive discretion, to waive the non-compete provisions contained within this section and this Agreement in the event Physician continues to participate with federal health care programs, specifically including Medicaid; that the Physician agrees, in the Practice, to treat any patient receiving medical benefits or assistance under any federal health care program in a nondiscriminatory manner; and Physician agrees to remain an active member of the Medical Staff of the Hospital, with all the privileges and subject to all the responsibilities of a Medical Staff member pursuant to and in accordance with applicable Medical Staff Bylaws and Rules and Regulations, including but not limited to all obligations to take call for the Hospital's emergency department. In the event of subsequent breach, Hospital will have all rights noted above to enforce the original non-compete terms.

**Future Sale of Practice**. In the event the Physician desires to terminate his employment and enter private practice, Hospital may sell, in its sole discretion, to Physician certain assets of the Hospital's practice based upon fair market value of such assets at the time employment is terminated. Any adjustment to the non-compete provisions contained in this Agreement allowing Physician to enter private practice and any sale of practice assets shall be reduced to writing and signed by both parties.

16.    **Severability**. In the event any Agreement clause or provision shall be held to be invalid or unenforceable, the same shall not affect the validity or enforceability of any other provision in the Agreement and this Agreement shall remain in full force and effect in all other respects. If a claim of invalidity or unenforceability of any Agreement provision is predicated upon the length of the term of any covenant or the area covered thereby, such provision shall not be deemed to be invalid or unenforceable; rather, such provision shall be deemed to be modified to the maximum area or the maximum duration as any court of competent jurisdiction shall deem reasonable, valid and enforceable.

17.   **Facilities, Equipment, Supplies and Support Personnel**.  The Hospital shall provide or arrange for all office facilities, equipment, supplies and support personnel reasonably required to provide services under this Agreement.  The Physician shall not engage in any direct purchasing or otherwise contract any liability on behalf of the Hospital.  The Hospital agrees, however, to consult with the Physician regarding the support staff employment and equipment and furnishings acquisition.

18.   **Quality of Services**.  All Physician services pursuant to this Agreement shall conform to: (i) all applicable federal, state and local governmental laws, rules and regulations; (ii) the Medical Staff Bylaws and Hospital Medical Staff Rules and Regulations; (iii) all applicable AOA Accreditation Requirements for Acute Care Hospitals or any other applicable accrediting a gency; (iv) a ll a pplicable t hird p arty p ayor standards established, including Blue Cross/Blue Shield of Michigan, Medicare, and Medicaid; and (v) all applicable Hospital policies and procedures.

19.   **Regulatory/Legislative Changes**.  The Hospital shall have the right to terminate this Agreement at any time upon ninety days (90) prior written notice to the Physician in the event that state or federal legislation or regulations are enacted or interpretive statements issued which, in the opinion of independent legal counsel acceptable to both parties: bars Physician referrals to the Hospital; eliminates Medicare or Medicaid reimbursement for such referrals; subjects the Hospital to potential civil or criminal penalties for such referrals; jeopardizes the Hospital's continued participation in the Medicare or Medicaid programs; or jeopardizes the Hospital standing as a tax-exempt institution under applicable federal or state law.

20.   **Benefit**.  This Agreement shall be binding upon and operate for the benefit of the parties and their respective heirs, representatives, successors and assigns.

21.   **Amendment**.  The Agreement may be amended at any time by mutual agreement of the parties, provided that before any amendment shall be operative or valid, it shall be reduced to writing and signed by both parties.

22.   **Entire Agreement**.  The parties understand and agree that this Employment Agreement is the entire Agreement between the parties regarding the terms and conditions.  The Agreement terms may not be varied, modified, supplemented or in any other way changed by extraneous verbal or written representations by the Hospital or its agents to the Physician.

23.   **Governing Law**.  This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Michigan.

24.   **Survival**.  The Covenants of Sections **4, 12 and 30** survive the termination of this Agreement.

9

25.  **Notice**.  All notices, demands, requests, consents, reports, approvals, or other communications which may be or are required to be given, served, or sent pursuant to this Agreement shall be in writing and shall be mailed by first-class, postage prepaid U.S. mail, or transmitted by hand delivery to the respective addresses of the parties set forth above.  Each party may designate by written notice a new address to which any notice or communication may thereafter be so given.

26.  **Third Parties**.  This Agreement shall be enforceable only by the parties and their successors in interest by virtue of an assignment, which is not prohibited under the Agreement terms, and no other person shall have the right to enforce any of the provisions contained herein.

27.  **Comptroller Access**.  In the event that the Secretary of Health and Human Services or the Comptroller General of the United States or their representatives determine that this Agreement is a contract described in Section 1861(v)(1)(I) of the Social Security Act, Physician agrees that until the expiration of four (4) years after the furnishing of services, he/she shall make available, upon written request to the Hospital by the Secretary of Health and Human Services, or upon request of the Comptroller General, this Agreement, and books, documents and records that are necessary to certify the nature and extent of costs the Hospital paid pursuant to this Agreement.

28.  **Assignment**.  This Agreement is personal to the Physician and his/her rights and obligations shall not be assignable unless the Hospital agrees in writing to such assignment.  The Hospital may in its discretion assign this contract as deemed necessary for future development.

29.  **Compliance with Laws, Rules and Regulations**.  The parties acknowledge that this Agreement is subject to, and agree to comply with, applicable local, state, and federal statutes, rules, and regulations.  Any such provisions that currently or in the future invalidate any Agreement term, that are inconsistent with any Agreement term, or that would cause one or both of the parties to be in violation of law while performing this Agreement shall be deemed to have superseded the Agreement terms.  The parties shall use their best efforts to accommodate the Agreement terms and intent consistent with applicable statutes, rules and regulations.

30.  **Annual Mandatory Training**.  The Physician shall complete all annual mandatory training requirements as set by the Hospital. (See New Employee Orientation and Employee Annual Re-Training Policy & Procedure P 2.24).

31.  **Representations**.  The Physician represents and warrants that he/she is in full compliance with all applicable laws, including licensing laws, and in good standing under the Federal Medicare program.  The Physician shall promptly notify the Hospital of any action to suspend, revoke, or restrict his/her license or Federal Medicare program good standing status.  If the Federal Medicare program sanctions the Physician, he/she may be terminated immediately.

32.  **Arbitration**.  Any controversy, dispute or claim arising out of or relating to this Agreement, or the breach of the Agreement, shall be settled in accordance with the then existing

10

American Arbitration Association Employment Rules. Judgment on any arbitration award may be entered in any court having jurisdiction. The Hospital and the Physician shall equally pay the arbitration fees and expenses.

33. **HIPAA Compliance.** To the extent a party provides to the other any information regarding or pertaining to its patients or to the extent a party receives information about a patient as an incidental or accidental consequence of the parties fulfilling their respective obligations under this Agreement, and in accordance with and pursuant to federal and state laws and regulations, including the Administrative Simplification provisions of the Health Insurance Portability and Accountability Act of 1996, 45 CFR Part 160 and 164, providing for the protection of patient health information, the parties agree to appropriately use and safeguard patient health information provided or disclosed to each other and to keep such information in strictest confidence in order to protect patient privacy, to the extent required by law. The parties business affairs and information, including, and without limitation to, information shared pursuant to this Agreement, are confidential and neither party will discuss such matters with or disclose the contents of this Agreement to anyone who is not a trustee, officer, agent, or a fiduciary of either party having a need to know such information in performance of his/her duties, all of whom shall be subject to this provision concerning confidentiality. The confidentiality obligations set forth in this Section are intended to carry on beyond the Agreement term, irrespective of whether this Agreement is terminated as provided herein or expires on its own terms.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date set below their respective names.

METRO HEALTH HOSPITAL

By: _____
Its: **Michael D. Faas, Its President**
Date: _____9/25/07_____

KEVIN ALTMAN, M.D.

_____

Date: _____9/2/07_____

Approved for signature
Legal Department

11

## EXHIBIT A
## EMPLOYED PHYSICIAN APPRAISAL FORM
(to be completed by employed physician's supervising physician or administrator)

Employed Physician's Name: _____

Please rate the physician in the following areas:

| CATEGORY | ABOVE AVERAGE | AVERAGE | BELOW AVERAGE |
|---|---|---|---|
| **Basic Medical Knowledge**<br>The physician possesses medical knowledge/skills comparable to that normally found in the medical community for the applicant's specialty. | | | |
| **Professional Knowledge/Judgment**<br>Physician is able to apply medical knowledge in establishing accurate diagnosis and appropriate treatment plans. | | | |
| **Responsibility/Dependability**<br>Patients, colleagues and hospital staff can depend on physician to fulfill commitments.  Physician accepts responsibility for his/her own professional decisions. | | | |
| **Ethical Conduct**<br>Physician upholds standards of ethics, as defined his/her affiliated professional organizations.  Physician places patient care above personal gain. | | | |
| **Clinical Competence**<br>Physician's patient outcomes are generally positive. | | | |
| **Cooperativeness/Interpersonal Relations**<br>Physician cooperates/listens to the opinions of others. Treats patients, colleagues and hospital staff with respect and common courtesy. | | | |
| **Health Status**<br>Physical and mental health condition is not likely to affect the applicant's ability to perform professional or medical staff duties appropriately. | | | |
| Complies with hospital and departmental standards and policies/procedures.<br>Physician is familiar and complies with hospital and departmental standards and/or policies/procedures | | | |

Exhibit A, page 12 of 17

| | | | |
|---|---|---|---|
| **Respect**<br>The physician has a favorable reputation in the lay and professional community (including subordinates, peers and superiors) for quality of medical practice. | | | |
| **Accuracy/Timeliness**<br>Physician's medical record documentation and/or verbal reports are accurate and timely. | | | |
| **Initiative**<br>Physician takes independent initiative to successfully follow through on tasks assigned to him/her. | | | |
| **Communication**<br>Physician maintains effective and open lines of communication with others, including subordinates, peers and superiors. | | | |

**Improvement areas**:

Please list any areas of improvement are recommended:

_____

_____

_____

**Goals**:

Please list any goals for this employee to improve performance

_____

_____

_____

I attest that in my role as supervisor of this employee that I have reviewed this appraisal form with the employed physician.

_____          _____
Supervising Physician                      Employed Physician

_____          _____
Date                                                  Date

Check all that apply:

_ ____ Employee is recommended for pay increase.

____ Employee's contract is recommended to be renewed for a period of _____.

____ Employee must meet additional criteria prior to contract renewal and/or pay increase (please list below),
        Re-evaluation to be performed in _____ (specify period):

_____

_____

Exhibit A, page 13 of 17

13

## EXHIBIT B
### Metro Health Physician Compensation Model
### (July 2007)

Total Physician Salary will be the sum total of the following:
- **A.   Physician Clinical Compensation & Incentive Payment**
- **B.   Supervision of Allied Health Professionals**
-   **Other Contracted Services**
- **D.   Managed Care Contract Surplus**
- **E.   Managed Care Physician Performance Programs (e.g. PIP, PRP, PFP)**
        **TOTAL PHYSICIAN SALARY**
   - **ANNUAL BASE SALARY**   (Annual Base Salaries will be an agreed upon amount)
        Incentive Payments      (Paid bi-annually)

### A.)  Physician Clinical Compensation & Incentive Payment

**1.)  GROSS BILLINGS** - Corresponding to every procedure, surgery or office visit is an amount that is reviewed at the beginning of every fiscal year (July 1-June 30) and adjusted as necessary. The fee schedule used for this model will be based on 2006-2007 fiscal year. Additionally, because the charge amount is consistent regardless of the insurance type of the patient, the physician is not negatively impacted by treating patients with lower insurance reimbursement. Gross billings do not take into account any laboratory, radiology or immunization services provided to the patients. It also does not include any non-clinical activity, i.e. expert witness fees, depositions, medical records fees, etc. All inpatient billings will be handed into the office manager within 30 days of the date of service in order to receive credit during the compensation model year unless approved by the VP/COO Metropolitan Enterprises or Director of Finance.

The physician's total gross billings shall be adjusted by the amount of any over or under payment by any health care payor or insurer during the relevant salary period, which are required as part of Metropolitan Enterprises corporate compliance program and relate to or result from inadequate, incomplete or improper documentation by the physician or the selection of an improper code or improper identification of a service by the physician. Gross billings shall be calculated, using this formula, on a semi-annual basis for each physician.

**2.)  21.5% ADJUSTMENT** - Total physician's gross billings are then adjusted by 21.5%. This adjustment rate is based upon the industry average percentage for insurance contractual allowances or Metropolitan Enterprises historical insurance contractual allowance less laboratory, radiology and immunization services.

**3.)  NET RECEIPT ALLOCATION** – Gross billings less insurance adjustment.

**4.)  TIERED PERCENTAGE FOR PHYSICIAN** (Percentage Amount of Pay) - This amount is determined by taking the Net Receipt Allocation less overhead expenses (based on the following tiered approach). For example, Dr. X's Net Receipt Allocation is $275,000. Dr. X would have a 44% overhead rate on the entire $275,000.

| Net Receipt Allocation $ | Overhead Charged |
|---|---|
| $    0.00  to $250,000 | = 45% |
| $250,001 to $350,000 | = 44% |
| $350,001 to $450,000 | = 43% |
| $450,001 to $550,000 | = 42% |
| $550,001 to $650,000 | = 41% |
| $650,001 + | = 40% |

14

**5.)  PHYSICIAN BASE SALARY** – Base salary is determined by utilizing the formula set forth in paragraphs 1, 2 and 4 above and applied to the physician's past productivity (usually a 1-3 year history) and is set at the beginning of each fiscal year and evaluated with possible adjustment every six months. For new employed physicians, the base salary is set and guaranteed pursuant to the compensation section of the employment agreement.  After this guarantee period, the Physician's Base Salary shall be set based on the physician's prior productivity.

**6.)  INCENTIVE PAYMENT** – If the physician's total production, by applying the above formula, plus compensation for supervision of allied health professionals as set forth in paragraph B below, for the 6 month period is greater than his total fiscal year to date compensation, then a bonus of the difference is paid to the physician.  Bonuses are given, if applicable, in the middle and at the end of each fiscal year.

Bi-annual incentive payments will be released based on the following criteria:

1).  Dictation must be completed within 24 hours of the patient visit.

**7.)  LEAVE OF ABSENCE** – Any leave taken for any reason (FMLA or non-FMLA) will not be used to prorate the production requirements for bonus calculations.  The bonus payment is production based.

**B.)  Supervision of Allied Health Professionals**

Each Site that supervises an Allied Health Professional will receive a stipend based on the following tiers of new and established patient visits:

| New and Established Patient Visits | Stipend |
|---|---|
| 0  to 1,700 | = $0 |
| 1,701 to 2,500 | = $5,000 |
| 2,501 to 3,300 | = $7,000 |
| 3,301 to 4,100 | = $9,000 |
| 4,101 + | = $11,000 |

All physicians at each site will determine in writing to the Director of Finance of Enterprises, how the stipend is to be allocated to the Physicians in each site.

**C.)  Other Contracted Services**

Payment for all contracted or non-clinical services and activities that the physician agrees to perform (services such as medical directorships, teaching/precepting activities, lectures, other professional service contracts) will be allocated to the physician providing the services less a percentage deduction of either 23.28% (for fringe benefits) or 36.28% (for fringe benefits and overhead) depending upon Metro Enterprises determination, in its sole discretion, as to whether the additional commitment requires an overhead allocation in addition to a fringe benefit cost allocation.  A description of and request for permission to provide other contracted services, covered under this section, must be submitted in writing for approval to the Metro Enterprises Board of Directors.

**D.)  Managed Care Contract Surplus**

Managed Care Contract Surplus funds will be allocated to the physician based on Metro Health Physician Hospital Organization, (hereafter referred to as "PHO"), criteria.  PHO criteria is set forth on the attached Schedule 1, as in effect at the time.  The PHO shall determine the amount each physician is eligible to receive.  Physician shall receive credit for the full-allocated amount.  Actual payment to the physician is based on whether the physician's Percentage Amount of Pay (gross billings, less insurance adjustments, less overhead expense) plus the surplus amount exceeds his total year to date

15

compensation. In the event it does not, no additional payment is made. If yes, the excess amount is paid to the physician. Surplus payments are usually given at the end of each contract term.

**E.) Managed Care Physician Performance Programs (e.g. PIP, PRP, PFP)**

PIP funds will be allocated to the physician. Physician shall receive credit for the full-allocated amount. Actual payment to the physician is based on whether the physician's Percentage Amount of Pay (gross billings, less insurance adjustments, less overhead expense) plus the surplus amount exceeds his total year to date compensation. In the event it does not, no additional payment is made. If yes the excess amount is paid to the physician. Physician performance program payments are usually issued in April and will be included in the Physician Compensation Model on a yearly basis. A pool of incentive dollars will be created by consensus of the Site Medical Directors based on the increased dollars of each providers performance program from 2004 calendar year. The pool is not to exceed 20% of the increase. The Enterprise staff and Allied Health Professionals will share in the pool based on objective criteria established by the Site Medical Directors.

The Physician Compensation Model and resulting payments will be reviewed annually to ensure they are in full compliance with all relevant laws, rules and regulations. In addition, physician compensation will be capped at the upper end of the relevant specialty range as determined by national physician compensation surveys including those conducted by the MGMA and the AMA. However, in the event the physician is providing additional services above and beyond the standard duties, the physician's compensation will be capped at 50% above the upper end of the relevant specialty range.

July 2007

**EXHIBIT A**

## MEDICAL DIRECTOR OF STROKE UNIT

**Principal Duties and Responsibilities:**

1. Spokesperson for the Stroke Center; to public and healthcare providers.
2. Stroke committee chairperson: Attends 100% of meetings.
3. Oversight of processes that ensure current and evidenced based stroke care.
4. Physician oversight and leadership to the stroke team.
5. Provide stroke education opportunities to healthcare providers, EMS providers and community: Minimum 6 hours/year.
6. Adhere to and promote adherence to American Stroke Association and JCAHO guidelines for primary stroke center designation.
7. Assess stroke benchmarking data and promote/implement changes as needed: approximately ½ hour/month.
8. Assure diagnostic departments, such radiology and lab, provide services to stroke patients according to JCAHO guidelines for primary stroke center certification.
9. Work collaboratively with stroke center program coordinator: Approximately 1 hour/month.
10. Complete 8hours minimum per year of stroke education.
11. Active participation in Joint Commission stroke center certification preparation and be present for Joint Commission on-site reviews of Metro Health's Stroke Center.

**Knowledge, skills and abilities:**

1. Doctor of Medicine or Osteopathy (MD or DO).
2. Specialized training in the management of neurological conditions.
3. Preferably a neurologist.
4. Clinically involved in acute care of stroke patients.
5. Practices evidence based medicine in an acute care setting.
6. Maintains clinical competency through practice, understanding of acute care standards and assessment of related research.