# PHYSICIAN EMPLOYMENT AGREEMENT

THIS AGREEMENT is made and entered into by and between **METRO HEALTH – UNIVERSITY OF MICHIGAN HEALTH**, a Michigan nonprofit corporation, of 5900 Byron Center Ave. S.W., Wyoming, Michigan 49519 (the "Hospital") and **KEVIN ALTMAN, M.D.** of **7784 HARMONY COVE CT SE, BYRON CENTER, MI 49315**, (the "Physician").

## RECITALS

The Hospital, a wholly owned subsidiary of Metropolitan Health Corporation, operates a general acute care hospital in Wyoming, Michigan. It also serves as a teaching facility for various clinical medical education programs. The Hospital desires to secure the services of a physician trained in **Neurology.**

The Physician is licensed to practice medicine in the State of Michigan (or shall be licensed no later than the first day of the Employment Term) and is qualified to practice in the area of **Neurology**. The Physician desires to enter into an Employment Agreement with the Hospital to provide the professional services required by the Hospital.

This Agreement shall supersede and replace any previous Employment Agreement between the parties and any and all amendments thereto, which shall terminate effective as of the first day of the Employment Term.

NOW, THEREFORE, in consideration of the promises and the mutual covenants in this Agreement, the parties agree as follows:

1. **Employment**. The Hospital shall employ the Physician as a full-time **1.0 FTE Neurology** Physician. The Hospital shall pro-rate Physician's FTE based on the number of hours he is permitted to work in accordance with applicable medical restrictions, unless such restrictions would result in an undue hardship for Hospital or result in a direct threat to Physician, patients, or another individual.

The Physician shall work for the Hospital upon the terms and conditions set forth in this Agreement. The Physician shall adhere to the Hospital policies and procedures including but not limited to, those noted below:

   a. Corporate Compliance Program and Code of Conduct Policy - #COMP-08
   b. Disruptive Medical Staff/Practitioners - #MS-06
   c. Corporate Compliance Education - #COMP-11
   d. Medicaid/Medicare Sanction Check - # COMP-12
   e. Problem Solving Guidelines - #HR-27
   f. Policy Against Harassment  - #HR-33
   g. Documentation and Billing for Teaching Physicians - #ME-02

All business the Physician develops and secures during the term of this Agreement shall be the Hospital's property. The Physician shall be an active member of the Hospital medical staff with clinical privileges, having achieved such status by application as provided in the Hospital Medical Staff Bylaws. This Agreement does not vest the Physician with medical staff membership.

2. **Exclusive Agreement**. The Physician shall devote his/her full time and best effort for the Hospital's benefit during the Employment Agreement term. This Employment Agreement prohibits the Physician from being involved financially or otherwise with any competing business organization. Physician shall not engage, directly or indirectly, in any other medical or surgical activities unless approved by the **Chief**

Exhibit B, page 1 of 17

**Medical Officer.** The Physician represents and warrants that he/she is not bound by any restrictive covenant or agreement that prevents or restricts him/her from performing his/her duties under this Agreement. The Physician agrees to indemnify and hold the Hospital harmless from any liability arising out of his/her breach of such covenant or agreement or the failure to disclose to the Hospital the existence of such covenant or agreement.

3. **General Duties.** Hospital shall employ the Physician as a medical doctor specializing in **Neurology.** The Physician shall abide by the general performance obligations in the Job Description as set forth in the attached **Exhibit A.** The Physician shall be a member of the American Osteopathic Association (AOA) or American Medical Association (AMA) as applicable. The Physician shall be evaluated on an annual basis as set forth in the Performance Evaluation as the Hospital Board of Directors or its designee may determine which are reasonably required, including Evaluation attached as **Exhibit B.** In general, the Physician will perform such duties and occupy those positions as the Hospital Board of Directors may determine which are reasonably required, including without limitation, patient treatment and diagnosis, participation in the training of interns and residents of the Hospital as assigned, and the participation in such third party payment or managed care programs as the Hospital may recommend from time to time. Physician may also be responsible for the supervision of a Physician Assistant or Nurse Practitioner at a practice site. Such supervision shall be in accordance with State and Federal requirements, laws, rules, and regulations. With respect to patient treatment, Physician shall exercise his/her independent medical judgment consistent with patient clinical needs and consent. The Hospital shall not have the right to direct the Physician to take or omit any act which conflicts with such medical judgment in the care of the patient. The Physician shall be available on an on-call basis according to a rotation schedule, established by the Department. The Physician shall at all times act in a manner which furthers the Hospital's professional image, and shall take such action as may be necessary to maintain and encourage the Hospital's relationship with its patients and other professionals which may include, at the request of the Hospital Board of Directors or a member of its executive leadership team, attending, at the cost of the Hospital, certain charitable, community or other social events as a representative of the Hospital if, in the Hospital's discretion, it is deemed beneficial to the Hospital's charitable mission and objectives. The Physician shall maintain a current knowledge on developments in the field of **Neurology** by attending a reasonable number of seminars or conventions each year.

4. **Fees and Billing.** The Hospital, shall establish a written fee schedule and charges for all services the Physician provides pursuant to this Agreement. The Hospital may amend this fee schedule and charges at any time and from time to time during the Agreement term. The Hospital or its appointed agent shall have the sole right to bill and collect from patients and third party payors (as applicable) for clinical services the Physician provides. The Hospital shall be entitled to retain all proceeds of those bills. The Physician shall not bill separately for any such services.

At the Hospital's request, the Physician shall execute and deliver agreements and other documents necessary for the Hospital to bill and be reimbursed directly for the Physician's services under this Agreement. The Physician shall deliver to the Hospital or its designated or assigned agent any sums paid to the Physician (by check, in cash, or otherwise) by any patient or third party payor (Blue Cross/Blue Shield of Michigan, Medicare, Medicaid, or otherwise) for services the Physician provides under this Agreement. The Physician's obligations in this Section shall continue even after this Agreement has terminated for services the Physician provided while a Hospital employee.

5. **Treatment of Patients.** Subject to the Peer Review Period set forth in paragraph 9(b), Physician shall have control over patient diagnosis and treatment for patients assigned to him/her, except in such instances as other physicians are "covering." The Physician agrees that his/her patient treatment and diagnosis will be consistent with applicable Hospital bylaws, rules and regulations, and Physician Code of Conduct. Physician understands that upon failure to do so, he/she may be relieved from treating the patient.

6. **Contracting**. Physician shall not enter into contracts binding upon the Hospital without the Hospital's express approval.

7. **Qualifications**. During this Agreement, the Physician shall: (i) maintain a permanent, unrestricted license to practice medicine in Michigan; (ii) be licensed and registered as necessary to dispense all narcotics and other drugs required to be dispensed in connection with the physician services provision in this Agreement; (iii) maintain in good standing such medical staff membership and privileges at the Hospital as shall be necessary to be able to perform the services required; (iv) participate in regular medical staff activities and responsibilities at the Hospital, including attendance at required meetings; (v) participate fully in all third party payment which the Hospital accepts; and (vi) be board certified or in the process of completing his/her board certification within the Initial Employment Term. Further, the parties agree that the Physician's continued employment with the Hospital, as well as his Return to Work date, is and will be contingent upon successful completion of all Contingencies set forth in paragraph 8, as well as Physician completing successful drug screening and other checks conducted consistent with Hospital's existing HR policies and Physician's completed credentialing with the Hospital's Medical Staff office as well as with all Payors determined to be essential by the Hospital in order to provide clinical services.

8. **Contingencies/Contingency Period**.

   a. The Parties agree that prior to Physician's Return to Work to commence the Initial Employment Term, the following Contingencies must be successfully completed by Physician:

      (i) Physician agrees to apply for and participate in the PACE Program Fitness for Duty and Competency Evaluation as requested by Hospital. Hospital shall pay all program/evaluation costs associated with the PACE Program Fitness for Duty and Competency Evaluation, and shall reimburse Physician for reasonable travel expenses (air/transportation, hotel and meals) incurred in connection with Physician's participation in the PACE Program Fitness for Duty and Competency Evaluation, in accordance with applicable IRS guidelines. Physician understands and acknowledges that his return to work will be contingent on successful clearance by the PACE Program regarding Physician's Fitness for Duty (subject to reasonable accommodation, if any), and Physician's Competency Evaluation.

      (ii) Physician's successful completion of any applicable medical staff requirements, including but not limited to Focused Professional Practice Evaluation ("FPPE") and/or Ongoing Professional Practice Evaluation ("OPPE") processes.

      (iii) Physician shall respond to requests for information concerning work-related restrictions (if any), and shall work with the PACE Program and Physician's own health care provider to provide information concerning job-related work restrictions Physician may have (if any) so that Hospital may determine whether any such restrictions may be reasonably accommodated, or whether accommodation of any such restrictions would result in an undue hardship on Hospital operations and/or patient care.

   b. The Contingency Period shall commence **May 14, 2018**, and run through the date Hospital receives notice of Physician's results from the PACE Program Fitness for Duty and Competency Evaluation.

   c. Physician agrees and acknowledges that the Contingencies identified in this section are job-related and consistent with business necessity, including but not limited to patient safety.

9. **Peer Review Period and Employment Term.**

   a. **Employment Term**. The Physician's employment term (the "Initial Employment Term") shall commence on the first business day following the successful completion of the Contingencies set forth in Paragraph 8 (unless otherwise mutually agreed to in writing by the parties) and terminate **June 30, 2020,** (subject to earlier termination provided in Section 11 below). At the end of the Initial Employment Term, the renewal employment term shall be **July 1st to June 30th**. The Agreement renews **automatically** for additional one (1) year periods unless either party gives written notice to the other of their intention not to renew at least ninety days (90) prior to the expiration of the Initial Employment Term or any renewal term. This Agreement may be renegotiated each year after the Initial Employment Term at either party's request. In the event the parties are unable to reach mutual agreement on compensation for an additional or renewal period, either party may terminate this agreement by written notice, effective not less than ninety days (90) after the date of such notice.

   b. **Peer Review Period.** Commencing with the start of the Initial Employment Term, Physician will be required to work at least 20 hours per week (or more if consistent with Physician's medical restrictions) and will be partnered with another physician in the same specialty who shall peer review the first 20 cases Physician completes to further assure patient safety. If any deficiencies are identified during this Peer Review Period, Hospital will work with Physician to provide additional training to attempt to remedy any identified deficiencies. The designated peer reviewer shall report to the Medical Executive Committee any concerns which have not been adequately remedied during the 20-case peer review period to determine whether and to what extent the peer review period should be extended or continued. If Physician demonstrates successful achievement during the Peer Review Period and Hospital concludes that Physician is satisfactorily progressing, this Agreement will continue for the remainder of the Initial Employment Term subject to the terms and conditions set forth in this Agreement.

   c. **Evaluation**. Prior to the end of the Initial Employment Term and thereafter on an annual basis prior to the end of any Renewal Period, Hospital shall evaluate Physician's progress in accordance with the attached Exhibit B to assess his continued competencies and assure patient safety.

10. **Compensation.**

    a. **Stipend**. In consideration of Physician's cooperation with the Fitness for Duty and Competency Evaluation process set forth herein, Hospital shall advance Physician a monthly stipend in the gross amount of $5,000.00 per month for up to three (3) consecutive months during the Contingency Period, subject to applicable taxes and withholdings ("Stipend"). The Stipend is intended help offset Physician's health insurance benefits and other expenses prior to Physician's Return to Work Date, and shall not exceed three (3) months, for a maximum gross advanced stipend payment of $15,000.00. Physician shall repay the total gross amount of the advanced Stipend via payroll deductions in a mutually agreeable amount upon his return to work. In the event Physician is unable to return to work for medical reasons, any amounts remaining due and owing on the Stipend advance shall be forgiven.

    b. **Salary**. The Hospital shall pay the Physician the greater of the then current compensation model established by the Hospital for the compensation of other

Exhibit B, page 4 of 17

**Neurology** specialists employed by the Hospital for all clinical duties or an annual base salary of **Two Hundred Seventy Thousand Dollars ($270,000)** "Annual Base Salary" for each year of his/her Initial Employment Term ("Initial Guaranteed Salary Term"). To the extent Physician provides medical documentation restricting the hours he can work, Hospital shall pro-rate the Physician's salary and benefits proportionately with Physician's FTE status. At the end of the Initial Employment Term, Physician's compensation shall be determined in accordance with the then current compensation model in place for other **Neurology** specialists employed by the Hospital. The parties further agree that other than any proportional pro-rating due to Physician's medically restricted hours, the Hospital may, on no more than an annual basis thereafter, amend the Physician's compensation model consistent with amendments made to the compensation model applicable to the Physician's specialty it employs. Payment shall be remitted to the Physician in accordance with normal payroll practices of the Hospital.

    (i)   Additional Compensation. The Hospital shall compensate the Physician for any additional days of neurology call as follows:

        For any additional days of neurology call after exceeding ten (10) days and no more than fifteen (15) days of call during a calendar month, at the rate of **Five Hundred Dollars ($500)** per 24-hour day of call coverage (7 a.m. to 7 a.m).

        For any additional days of neurology call after exceeding Fifteen (15) days of call during a calendar month, at the rate of **Seven Hundred and Fifty dollars ($750)** per 24-hour day of call coverage (7 a.m. to 7 a.m).

c.   **Expenses**. The Hospital shall reimburse the Physician for all reasonable, legitimate and documented business expenses incurred for attending professional CME conferences appropriate to their specialty, in an amount consistent with the then current Hospital policy applicable to like physicians. The Hospital shall also reimburse the Physician for professional organizational dues/fees as required or related to the Physician's services provided under this Agreement in an amount consistent with the then current Hospital policy applicable to like physicians. Current Hospital limits and conditions for such expense reimbursement are set forth on Exhibit C.

d.   **Additional Benefits**. In addition to the compensation described above, the Physician shall be entitled during the Employment Term to receive additional benefits consistent with those then currently offered to other like physicians, pursuant Hospital approved benefits programs. Current physician benefits applicable to Physician are set forth on **Exhibit C**. Physician understands that any such benefits will be proportionately pro-rated in accordance with Physician's FTE status, which shall be based on the number of weekly hours Physician is able to work in accordance with Physician's medical restrictions.

e.   **Life Insurance Premium Payments.** Hospital will advance payment to Physician to cover the cost of converting his life insurance premium for policy number XXXXXXX[redacted], in the amount of **Five Thousand Eight Hundred Thirty-two Dollars ($5,832.00)**. Physician shall repay that advance via payroll deductions in a mutually agreeable bi-weekly amount upon his return to work. In the event Physician is unable to return to work for medical reasons, any amounts remaining due and owing on the life insurance premium conversion advance shall be forgiven.

11.     **Termination of Employment**. Notwithstanding that the Initial Employment Term or

any Renewal Term has not expired, this Agreement may be terminated in accordance with the following:

(a) **Hospital Termination**. The Hospital shall have the right to terminate this Agreement immediately under any one or more of the following circumstances, in which event no compensation or additional benefits shall be owed following the termination effective date:

(i) **Breach**. Breach of the terms of this Agreement by the Physician where such breach is not corrected within thirty (30) days after written notice is provided to the Physician by the Hospital. Hospital in its sole discretion shall determine whether Physician shall be allowed to continue to see patients and provide clinical care following Hospital's written notice of a breach and/or whether Physician shall be paid his/her compensation following Hospital's written notice of breach but removed from all clinical care duties. Hospital reserves the right to terminate this Agreement, Physician's employment, and all compensation and benefits immediately and without written notice or opportunity to cure for any material breach by Physician which, in Hospital's sole discretion, is not able to be remedied to the Hospital's satisfaction.

(ii) **Criminal Activity**. The Physician is convicted of any felony involving moral turpitude.

(iii) **Professional Standing**. The Physician ceases to be a member in good standing of the Hospital's medical staff for any reason, including an adverse recommendation for disciplinary action by any medical staff committee, or by the governing body, or if his/her license to practice medicine or to dispense narcotics or controlled substances is suspended, denied, limited or revoked for any reason.

(iv) **Death**. By the Hospital, automatically upon the Physician's death.

(v) **Disability**. Physician's inability to provide professional medical services consistent with Hospital's business need due to disability resulting from injury, sickness, disease, or other cause if such disability continues for a period of three (3) consecutive months, and if the Physician's attending physician and the Hospital's physician confirm the disability to be of a long term nature expected to continue for at least 12 months from onset for which there is no possible reasonable accommodation. If the two physicians cannot agree, those physicians shall choose a third physician whose decision shall be binding on all parties.

(b) **Physician Termination.** The Physician shall have the right to terminate this Agreement immediately under any one or more of the following circumstances:

(i) **Hospital Licensure**. If at any time the Hospital loses its license to operate as a hospital.

(ii) **Breach**. Hospital breaches any term(s) of this Agreement where such breach is not corrected within thirty days (30) after Physician provides written notice.

(c) **Termination by Mutual Consent**. The parties can terminate this Agreement before the expiration of any term by mutual written consent. Provided, however, the parties agree that if this Agreement is terminated prior to the end of the 1st twelve months of the term, the parties shall not enter into another agreement for the provision of the same or substantially similar services during the first twelve months of the term.

(d) **Termination by Either Party**. Either party may terminate this Agreement for any reason at any time on ninety days (90) prior written notice to the other. Provided, however, the parties

Exhibit B, page 6 of 17

agree that if this Agreement is terminated prior to the end of the 1st twelve months of the term, the parties shall not enter into another agreement for the provision of the same or substantially similar services during the first twelve months of the term. Physician understands and agrees that it shall be with the sole discretion of the Hospital to determine whether Physician shall be allowed to continue to see patients and provide clinical care during the notice period or whether Physician shall be paid his/her compensation during the notice period but removed from all clinical care duties.

12. **Duty of Physician Upon Termination**. The Physician shall, upon Agreement termination, return to the Hospital all the Hospital's records of any sort, including patient medical records, and all literature, supplies, letters, written or printed forms, and/or memoranda pertaining to the Hospital's business within forty-eight (48) hours of such termination and without Hospital demand. In addition, the Physician shall have a continuing obligation to cooperate with the Hospital with respect to malpractice and other litigation regarding the services provided pursuant to this Agreement.

13. **Non-competition**. Intentionally Omitted.

14. **Future Sale of Practice**. In the event the Physician desires to terminate his/her employment and enter private practice, Hospital may sell, in its sole discretion, to Physician certain assets of the Hospital's practice based upon fair market value of such assets at the time employment is terminated. Any adjustment to the non-compete provisions contained in this Agreement allowing Physician to enter private practice and any sale of practice assets shall be reduced to writing and signed by both parties.

15. **Severability**. In the event any Agreement clause or provision shall be held to be invalid or unenforceable, the same shall not affect the validity or enforceability of any other provision in the Agreement and this Agreement shall remain in full force and effect in all other respects. If a claim of invalidity or unenforceability of any Agreement provision is predicated upon the length of the term of any covenant or the area covered thereby, such provision shall not be deemed to be invalid or unenforceable; rather, such provision shall be deemed to be modified to the maximum area or the maximum duration as any court of competent jurisdiction shall deem reasonable, valid and enforceable.

16. **Facilities, Equipment, Supplies and Support Personnel**. The Hospital shall provide or arrange for all office facilities, equipment, supplies and support personnel reasonably required to provide services under this Agreement. The Physician shall not engage in any direct purchasing or otherwise contract any liability on behalf of the Hospital. The Hospital agrees, however, to consult with the Physician regarding the support staff employment and equipment and furnishings acquisition.

17. **Quality of Services**. All Physician services pursuant to this Agreement shall conform to: (i) all applicable federal, state and local governmental laws, rules and regulations; (ii) the Medical Staff Bylaws and Hospital Medical Staff Rules and Regulations; (iii) all applicable AOA Accreditation Requirements for Acute Care Hospitals or any other applicable accrediting agency for a clinical site where the Physician provides services pursuant to this Agreement; (iv) all applicable third party payor standards established, including Blue Cross/Blue Shield of Michigan, Medicare, and Medicaid; and (v) all applicable Hospital policies and procedures.

18. **Regulatory/Legislative Changes**. The Hospital shall have the right to terminate this Agreement at any time upon ninety days (90) prior written notice to the Physician in the event that state or federal legislation or regulations are enacted or interpretive statements issued which, in the opinion of independent legal counsel acceptable to both parties: bars Physician referrals to the Hospital; eliminates Medicare or Medicaid reimbursement for such referrals; subjects the Hospital to potential civil or criminal penalties for such referrals; jeopardizes the Hospital's continued participation in the Medicare or Medicaid programs; or jeopardizes the Hospital standing as a tax-exempt institution under applicable federal or state law.

Exhibit B, page 7 of 17

19. **Benefit**. This Agreement shall be binding upon and operate for the benefit of the parties and their respective heirs, representatives, successors and assigns.

20. **Amendment**. The Agreement may be amended at any time by mutual agreement of the parties, provided that before any amendment shall be operative or valid, it shall be reduced to writing and signed by both parties.

21. **Entire Agreement**. The parties understand and agree that this Employment Agreement is the entire Agreement between the parties regarding the terms and conditions. The Agreement terms may not be varied, modified, supplemented or in any other way changed by extraneous verbal or written representations by the Hospital or its agents to the Physician.

22. **Governing Law**. This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Michigan.

23. **Survival**. The Covenants of Sections 4, 12, 31 and 32 survive the termination of this Agreement.

24. **Notice**. All notices, demands, requests, consents, reports, approvals, or other communications which may be or are required to be given, served, or sent pursuant to this Agreement shall be in writing and shall be mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, or transmitted by hand delivery to the respective addresses of the parties set forth above. Each party may designate by written notice a new address to which any notice or communication may thereafter be so given.

25. **Third Parties**. This Agreement shall be enforceable only by the parties and their successors in interest by virtue of an assignment, which is not prohibited under the Agreement terms, and no other person shall have the right to enforce any of the provisions contained herein.

26. **Comptroller Access**. In the event that the Secretary of Health and Human Services or the Comptroller General of the United States or their representatives determine that this Agreement is a contract described in Section 1861(v)(1)(I) of the Social Security Act, Physician agrees that until the expiration of four (4) years after the furnishing of services, he/she shall make available, upon written request to the Hospital by the Secretary of Health and Human Services, or upon request of the Comptroller General, this Agreement, and books, documents and records that are necessary to certify the nature and extent of costs the Hospital paid pursuant to this Agreement.

27. **Assignment**. This Agreement shall not be assignable by the Physician unless the Hospital agrees in writing to such assignment. The Hospital may in its discretion assign this contract as deemed necessary for future development.

28. **Compliance with Laws, Rules and Regulations**. The parties acknowledge that this Agreement is subject to, and agree to comply with, applicable local, state, and federal statutes, rules, and regulations. Any such provisions that currently or in the future invalidate any Agreement term, that are inconsistent with any Agreement term, or that would cause one or both of the parties to be in violation of law while performing this Agreement shall be deemed to have superseded the Agreement terms. The parties shall use their best efforts to accommodate the Agreement terms and intent consistent with applicable statutes, rules and regulations.

29. **Annual Mandatory Training**. The Physician shall complete all annual mandatory training requirements as set by the Hospital. (See New Employee Orientation and Employee Annual Re-Training Policy & Procedure HR-30).

30. **Representations**. The Physician represents and warrants that he/she is in full compliance with all applicable laws, including licensing laws, and in good standing under the Federal Medicare program. The Physician shall promptly notify the Hospital of any action to suspend, revoke, or restrict his/her license or Federal Medicare program good standing status. If the Federal Medicare program sanctions the Physician, he/she may be terminated immediately.

31. **Arbitration**. Any controversy, dispute or claim arising out of or relating to this Agreement, or the breach of the Agreement, shall be settled in accordance with the then existing American Arbitration Association Employment Rules. Judgment on any arbitration award may be entered in any court having jurisdiction. The Hospital and the Physician shall equally pay the arbitration fees and expenses.

32. **HIPAA Compliance**. To the extent a party provides to the other any information regarding or pertaining to its patients or to the extent a party receives information about a patient as an incidental or accidental consequence of the parties fulfilling their respective obligations under this Agreement, and in accordance with and pursuant to federal and state laws and regulations, including the Administrative Simplification provisions of the Health Insurance Portability and Accountability Act of 1996, 45 CFR Part 160 and 164, providing for the protection of patient health information, the parties agree to appropriately use and safeguard patient health information provided or disclosed to each other and to keep such information in strictest confidence in order to protect patient privacy. The parties business affairs and information, including, and without limitation to, information shared pursuant to this Agreement, are confidential and neither party will discuss such matters with or disclose the contents of this Agreement to anyone who is not a trustee, officer, agent, or a fiduciary of either party having a need to know such information in performance of his/her duties, all of whom shall be subject to this provision concerning confidentiality. The confidentiality obligations set forth in this Section are intended to carry on beyond the Agreement term, irrespective of whether this Agreement is terminated as provided herein or expires on its own terms.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the date set below their respective names.

**METRO HEALTH - UNIVERSITY OF MICHIGAN HEALTH**         **KEVIN ALTMAN, M.D.**

By:_____       By: _____

   **Michael D. Faas**

Its:   **President & CEO**

Date:_____        Date: _____

Exhibit B, page 9 of 17

EXHIBIT A
METRO HEALTH JOB DESCRIPTION

**TITLE:** Physician
**JOB CODE:** Assigned by HR
**DEPARTMENT:** Medical Staff
**FLSA STATUS:** Assigned by HR
**MANAGER TITLE:** CMO/Executive VP – Chief Physician Officer of System Integration Alignment/or Designee

**DATE APPROVED:** July 2017

### General Summary:

Responsible for the direct health care of a specified patient population within Metro Health and practices within defined, requested privileges.

### Reporting Relationships:

Positions Supervised: None
First Level Supervisor: CMO/ Executive VP – Chief Physician Officer of System Integration Alignment/or Designee

### Essential Functions and Responsibilities:

1. Provides and manages direct patient care, including physical examinations, evaluations, assessments, diagnoses and treatment for a specified patient population.
2. Prescribes pharmaceuticals, other medications, and treatment regimens as appropriate to assessed medical conditions.
3. Refers patients to specialists and other patient care resources as appropriate.
4. Timely and accurately documents all care and treatment.
5. Trains and supervises medical students and residents engaged in specialty activities and procedures, as appropriate.
6. May be involved in the management of the operations of a specific medical program, patient care unit, or research functions.
7. Supports a culture of safety.
8. Works with the care team to provide efficient patient care services focused on the patient.
9. Follows established hospital/departmental policies, procedures, and objectives, continuous quality improvement objectives, and safety, environmental, and/or infection control standards.
10. As appropriate to the position, participates in specified health promotion, education and/or prevention programs.
11. Recognizes and reports problems, errors and discrepancies through the hospital occurrence reporting system and/or to the CMO.
12. Organizes and prioritizes assigned work and schedules time to accommodate work demands, turnaround time requirements and commitments. As appropriate, adheres to established work schedules to maintain timely visits with patients and patient access.
13. Adheres to the hospital's corporate compliance standards regarding proper documentation for billing and reimbursement purposes and also relative to the teaching physician supervision of interns and residents.

**Knowledge, Skills and Abilities:**
- Education requirement
- Experience requirement
- Certification / License requirement
- Well-developed verbal and written communication skills
- Strong telephone skills and etiquette
- Knowledge of basic math and office/hospital procedures
- Ability to work under pressure with minimal supervision
- Proven flexibility and willingness to handle a variety of tasks
- Basic computer knowledge and skills
- Experience with computer data entry and strong typing skills

**Behavioral Expectations:**
1. Support the mission, vision, and values of the organization.
2. Treat others and their ideas with respect and dignity.
3. Set a good example for others.
4. Be an active coach for everyone in the Metro Health System.
5. Maintain the highest standards of honesty, integrity, and communication.
6. Insist on excellence and be accountable to one another.
7. Build group cohesiveness and pride through teamwork.
8. Demonstrate confidence in Metro Health and its workforce in all areas of the community.
9. Value and promote creativity and supports the change process.
10. Be a good communicator and listener; be available and visible.
11. Develop yourself to your highest potential.
12. Active participation in Quality Initiatives.
13. Maintains current certifications, licenses, and professional other requirements, as appropriate.
14. Attendance demonstrates commitment and sense of professional responsibility to employees and the organization.
15. Cost awareness, concern for cost containment and the conservation of resources are reflected in activities. Exhibits openness and willingness to try new approaches and systems.
16. Conflicts and problems are resolved through discussion with appropriate personnel. Behavior reflects an effort to build staff morale, solve problems and display loyalty to the organization.

**Physical Requirements/Working Conditions:**
Overall strength requirements.
Strength (Check one)

| | | |
|---|---|---|
| ___ | Sedentary | Lifting up to 10 lbs. occasionally and/or negligible amount |
| ___ | Light Work | Lifting 20 lbs. maximum with frequent lifting and/or carrying objects weighing up to 10 lbs. |
| ___ | Medium Work | Lifting 50 lbs. maximum with frequent lifting and/or carrying of objects up to 25 lbs. |
| ___ | Heavy Work | Lifting 100 lbs. maximum with frequent lifting and/or carrying of objects weighing up to 50 lbs. |
| _x_ | Very Heavy Work | Lifting objects in excess of 100 lbs with frequent lifting and/or carrying objects weighing 50 lbs. or more. |

Physical and Visual Activities Checklist
**Key**

Exhibit B, page 11 of 17

N = Not Present: Not Applicable
I = Infrequent: Not daily but included 1-3 times per week
O = Occasional: Done intermittently throughout shift for a total of 0-2.5 Hrs/Day (1-33%)
F = Frequent: Done at longer intervals throughout shift for a total of 2.5-5.5 Hrs/Day (34-66%) C
= Constant: Done without interruption throughout shift for a total of 5.5+ Hrs/Day (67-100%)

| Physical Activity | N | I | O | F | C | Physical Activity | N | I | O | F | C |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Standing | | | x | | | Walking | | | | | x |
| Sitting | | | x | | | Climbing | | x | | | |
| Carrying | | | x | | | Stooping | | | | x | |
| Balancing | | x | | | | Kneeling | | | | x | |
| Crouching | | | x | | | Crawling | | x | | | |
| Handling | | | | x | | Fingering | | | | x | |
| Feeling | | | | x | | Talking | | | | | x |
| Hearing | | | | | x | Acuity, Far | | | | x | |
| Acuity, Near | | | | x | | Depth Perception | | | | x | |
| Field of Vision | | | x | | | Accommodation | | | | x | |
| Color Vision | | | | x | | Reaching | | | | | x |
| Physical Position Change | | | | | x | | | | | | |

**Physical Demands Checklist:** List the amount of weight in each column.

| Activity | Not Present | Infrequent | Occasional | Frequent | Constant |
|---|---|---|---|---|---|
| Pushing | | | x | | |
| Pulling | | | x | | |
| Lifting-from Floor | | | x | | |
| Lifting -from Table/Bed Height | | | | x | |
| Lifting -from Overhead | | | x | | |

**Working Conditions Checklist**

| Environmental / Atmospheric | N | I | O | F | C | Environmental / Atmospheric | N | I | O | F | C |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Inside Conditions | x | | | | | Outside Conditions | x | | | | |
| Both Conditions | x | | | | | Extremes of Cold | | | x | | |
| Cold Temperature Changes | | x | | | | Extremes of Heat | | | x | | |
| Hot Temperature Changes | | x | | | | Wet | | | | x | |
| Humid | x | | | | | Noise | x | | | | |
| Vibration | x | | | | | Hazards | | | | x | |
| Fumes | | x | | | | Odors | | | x | | |
| Dust | | | | | | Poor Ventilation | | x | | | |
| Unusual Office Environmental Condition | | | | | | Latex | | x | | | |

*Job Descriptions are subject to change to meet organizational requirements. The employer has the right to change job descriptions as necessary.*

**EXHIBIT B**
**EMPLOYED PHYSICIAN APPRAISAL FORM**
(to be completed by employed physician's supervising physician or administrator)

Employed Physician's Name: _____

Please rate the physician in the following areas:

| CATEGORY | ABOVE AVERAGE | AVERAGE | BELOW AVERAGE |
|---|---|---|---|
| **Basic Medical Knowledge** The physician possesses medical knowledge/skills comparable to that normally found in the medical community for the applicant's specialty. | | | |
| **Professional Knowledge/Judgment** Physician is able to apply medical knowledge in establishing accurate diagnosis and appropriate treatment plans. | | | |
| **Responsibility/Dependability** Patients, colleagues and hospital staff can depend on physician to fulfill commitments. Physician accepts responsibility for his/her own | | | |
| **Ethical Conduct** Physician upholds standards of ethics, as defined his/her affiliated professional organizations. Physician | | | |
| **Clinical Competence** Physician's patient outcomes are generally positive. | | | |
| **Cooperativeness/Interpersonal Relations** Physician cooperates/listens to the opinions of others. Treats patients, colleagues and hospital staff with respect | | | |
| **Health Status** Physical and mental health condition is not likely to affect the applicant's ability to perform professional or | | | |
| Complies with hospital and departmental standards and policies/procedures. | | | |
| **Physician is familiar and complies with hospital Respect** The physician has a favorable reputation in the lay and professional community (including subordinates, peers and superiors) for quality of medical | | | |
| **Accuracy/Timeliness** Physician's medical record documentation and/or verbal | | | |
| **Initiative** Physician takes independent initiative to successfully follow through on tasks assigned to him/her. | | | |

| Communication<br>Physician maintains effective and open lines of communication with others, including subordinates, peers and superiors. | | | |
|---|---|---|---|

**Improvement areas:**

Please list any areas of improvement are recommended:

_____
_____
_____

**Goals:**

Please list any goals for this employee to improve performance

_____
_____
_____

I attest that in my role as supervisor of this employee that I have reviewed this appraisal form with the employed physician.

_____     _____
Supervising Physician                   Employed Physician


_____     _____
Date                                    Date

Check all that apply:
_____ Employee's contract is recommended to be renewed for a period of _____.
_____ Employee must meet additional criteria prior to contract renewal and/or pay increase (please list below). Re-evaluation to be performed in _____ (specify period):

_____
_____
_____

## EXHIBIT C
## Expenses and Benefits

**Expenses:**

The Hospital currently reimburses physicians for all reasonable, legitimate and documented business expenses incurred for attending professional CME conferences appropriate to their specialty, professional organizational dues, and/or professional licensing fees ("Comprehensive CME") as required or related to the Physician's services provided under this Agreement, in an amount not to exceed **$5,000.00** per year. Comprehensive CME is based on budget year and is not transferable to the following year. Any additional fees above **$5,000.00** will need approval of the CMO.

**Benefits:**

Following satisfactory completion of applicable Contingencies, upon the start of the Initial Employment Term, Hospital will provide Physician with the following benefits:

    (a) **Insurance.** The Hospital shall provide the Physician with the following insurance coverages:

        (i) **Professional Liability Insurance**. The Hospital will provide occurrence based professional liability insurance to the Physician from its self- insurance plan with limits of $3,000,000/$6,000,000 and any excess policy in effect at such time. The Hospital may change the self-insurance plan and/or any excess insurance, including its limits, at any time as determined by the Hospital. Such insurance will cover Physician's services under this Agreement. The Hospital shall maintain appropriate "tail" insurance coverage with respect to the services provided under this Agreement, through its self- insurance plan in the event the Physician's employment terminates for any reason.

The Hospital and Physician each agree to promptly notify the other of claims or incidents, which may result in claims. Physician agrees to fully cooperate with the Hospital in investigating any such claim or incident. The Hospital shall have the right to settle any claim or suit without the Physician's consent. The Hospital shall notify the Physician of any settlements.

        (ii) **Health and Dental Insurance**. The Hospital will provide the Physician and any dependents with the health and dental insurance the Hospital provides to other Hospital employees of similar FTE status. Physician must make the appropriate required contribution toward the insurance, provided the Physician qualifies for coverage under such plan. Physician understands that offered benefits will be pro-rated consistent with Physician's FTE status.

        (iii) **Long Term Disability Insurance**. The Hospital will provide the Physician with long term disability insurance under the Hospital's group disability insurance plan in effect, provided the Physician qualifies for coverage under such plan, consistent with Physician's FTE status.

        (iv) **Life Insurance**. The Hospital will provide the Physician with group term life insurance, in an amount equal to three times the Physician's Annual Salary provided the Physician qualifies for participation under the Hospital's group policy, consistent with Physician's FTE status.

(v)     **Salary Continuation Plan**. (See Salary Continuation policy HR-69 and Leave of Absence policy HR-62).

(b)     **Paid Time Off /CME Leave (PTO)**. (Referred to in "Paid Time Off" policy" HR-67) Subject to prorating based upon FTE status, the Physician will receive a total of **one hundred eighty-four (184) hours** paid for PTO leave for each 12-month employment period. Based on FTE status the Physician will be paid for six (6) holidays (New Year's Day, Memorial Day, July 4th, Labor Day, Thanksgiving and Christmas). The Physician may be required to work one or more of these holidays, in which case Hospital will make every effort to provide Physician with an additional day off with pay in that pay period. Worked holidays do not result in additional payment to Physician. The Physician must request PTO at least thirty days (30) in advance of the date PTO is to begin and will be at the discretion of the Chief Medical Officer of Metro Health, which approval shall not be unreasonably withheld and shall be consistent with determinations made for other similarly employed physicians.

PTO leave must be taken during the 12-month employment period earned. It may not be carried forward to a new 12-month employment period and irrespective of any other policy of Employer that may be in place, it may not be cashed out for compensation at the end of each 12-month employment period earned if the Physician is employed with the Hospital. If the Physician's employment terminates consistent with Paragraph 11 (a), (i), (ii), or (iii), then the Physician shall not be paid for any unused PTO leave time. If the Physician is terminated or leaves for any other reason, then the Hospital shall prorate the PTO leave time to date of termination/leave, deduct any PTO leave time already used in the 12-month employment period, and then pay out any difference to the Physician.

Physician may, but is not required to, utilize available PTO during the Contingency Period.

(c)     **Retirement Plan(s)**. The Physician shall be entitled to participate in the Hospital's retirement plan under the terms and conditions of such plan.

Exhibit B, page 17 of 17