UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| **CHERYLYNNE E. ALTMAN,** as the beneficiary of Dr. Kevin C. Altman and as Personal Representative of the Estate of Dr. Kevin C. Altman, deceased, <br><br> Plaintiff, <br><br> -v- <br><br> **UM HEALTH, a Michigan non-profit corporation; METROPOLITAN HOSPITAL,** a Michigan non-profit corporation; and **METRO HEALTH HOSPITAL EMPLOYEE BENEFIT PLAN,** an employee welfare benefit plan. <br><br> Defendants. | Case No.: 1:22-cv-00098-JMB-PJG <br><br><br> **PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT UNDER FED. R. CIV. P. 12(b)(6)** <br><br> *(ORAL ARGUMENT REQUESTED)* |

Todd R. Dickinson (P30876)
FISHER & DICKINSON P.C.
Attorneys for Plaintiff
678 Front Avenue NW, Suite 360
Grand Rapids, MI  49504
(616)-575-5655
trd@fisher-dickinson.com

K. Scott Hamilton
DICKINSON WRIGHT PLLC
Attorneys for Defendants
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3500
khamilton@dickinsonwright.com

## I.    INTRODUCTION

Dead men may tell no tales, but the discovery process permitted by the Federal Rules of Civil Procedure might nonetheless shed valuable light on the employment relationship between a large hospital system and a dying physician in his final days.  Through the tools of discovery, the federal courts have adopted a robust fact exposure process created across hundreds of years of common law tradition. In this case, the discovery process represents the only means by which this Plaintiff can obtain answers about why her now-deceased husband's employer repeatedly and inexplicably frustrated his attempts to return to work in the profession he loved during his final days.  And it is reasonably expected that what discovery could reveal may entitle Plaintiff to financial relief as a result of the employer's mishandling of her husband's return to employment.

The plaintiff in this case is Cherylynne Altman, who is the personal representative of the estate of Dr. Kevin C. Altman, who is deceased.  Dr. Altman spent years employed as a clinical neurologist by Defendants UM Health and Metro Health (collectively referred to herein as "Metro Health), and it is expected that Metro Health would concur that he served in this role with exemplary dedication and service during his tenure.  But after Dr. Altman was diagnosed with an aggressive and painful form of cancer known as myelogenous leukemia in September of 2016, Ms. Altman and Dr. Altman's life changed forever.

In this case, many, many questions of fact have become obscured due to circumstance.  For example (and certainly without limitation):

- Did Dr. Altman execute a revised and updated employment agreement with Metro Health in June of 2018, or were the terms and conditions of his employment controlled at the time of his death by the one he signed with Metro Health in 2007 instead?

1

- Did Dr. Altman have the opportunity to protest the discontinuation of his group life insurance policy under "waiver of premium" coverage when the Defendant Plan informed him in April of 2018 that his period of disability had ended in April of 2018, or were – as Ms. Altman reasonably suspects – those efforts fruitless and futile?

- Was Metro Health's decision to subject Dr. Altman to the PACE Program's evaluation prior to his return to work actually job-related and consistent with business necessity based on an individual evaluation of his circumstances?

Two parties know the answer – Metro Health and Dr. Altman.  Dr. Altman can no longer tell his story.  And Metro Health has asked to avoid discovery, which would improvidently and unjustly deprive Ms. Altman of her opportunity to obtain evidence to support her claims.  For those reasons described further below, the Court should deny Defendants' Motion to Dismiss and permit the parties to proceed to discovery to better understand what happened in this tragic and unfortunate situation.

## II.    COUNTER-STATEMENT OF FACTS

Defendants' statement of facts presents a seriously distorted picture of the events from which this case arises, ignoring or glossing over critically important allegations set forth in Plaintiff's amended complaint.

The predicament in which Dr. Altman found himself in May of 2018 was that Metro Health refused to allow him to return to work, notwithstanding that:

- Dr. Altman's treating physician had pronounced him ready to resume his duties as a clinical neurologist at the Hospital (subject only to some readily manageable restrictions) (R.13, Am. Compl., PageID.223, ¶ 30);

- Dr. Altman himself felt ready to resume those duties (R.13, Am. Compl., PageID.223, ¶ 31); and most critically,

- The insurance company that underwrote the Plan had determined that Dr. Altman was no longer eligible for the waiver of premiums that had allowed him to maintain his life insurance coverage during the period when he was not working and collecting his regular salary, because his recovery from the debilitating effects of his cancer treatment had progressed to the point where he was no longer considered disabled. (R.13, Am. Compl., PageID.224, ¶¶ 37, 38)

This decision by Metro Health – which considered absolutely no objective evidence concerning Dr. Altman's physical condition, remission status, or fitness to return to work – left Dr. Altman unable to earn the salary he needed to resume making the very hefty premium payments necessary to continue in force the full amount of the insurance coverage to which he would be eligible upon his return to active duty. (R.13, Am. Compl., PageID.225, ¶ 39) As a result, Dr. Altman was compelled to convert his $750,000 policy to a more affordable $120,000 policy. (R.13, Am. Compl., PageID.225, ¶ 40).  His protests to the contrary demonstrated that neither the insurer nor Metro Health were willing to reconsider their inconsistent positions concerning Dr. Altman's disability. (R.13, Am. Compl., PageID.225, ¶ 41).

Dr. Altman did not agree with Metro Health's decision to require him to travel to San Diego and undergo an assessment of his fitness by the PACE program before he was allowed to return to work. In fact, Dr. Altman complained bitterly about it to

colleagues and, upon information and belief, to Metro Health's HR Department and administration. But he ultimately concluded that he had no real choice in the matter, and that the quickest way out of his predicament was to acquiesce in Metro Health's demands and attend the PACE program they required. (R.13, Am. Compl., PageID.226, ¶¶ 46,47).

Dr. Altman did not choose the PACE program, and its suitability for the purpose of evaluating a physician in Dr. Altman's situation was never clear. (R.13, Am. Compl., PageID.225-226, ¶¶ 44-46). In fact, it is totally unclear whether Metro Health had ever previously (or subsequently) used the PACE program for such a purpose.

Yet even though Metro Health insisted that Dr. Altman attend the PACE program, they failed to take reasonable steps to facilitate his completion of that program and their own receipt of the resulting assessment of Dr. Altman's fitness. Even though Metro Health had determined no later than May 16, 2018, to require Dr. Altman to attend the PACE program, and Dr. Altman promptly completed and returned all the paperwork PACE requested from him (R.13, Am. Compl., PageID.226, ¶ 48), Metro Health failed to make the payments PACE required to even allow Dr. Altman to register for the program until sometime after July 16, 2018 (R.13, Am. Compl., PageID.227-228, ¶¶ 57-62), *a delay of more than two months!*

Furthermore, although Dr. Altman went to considerable lengths to complete the PACE program before the end of July (R.13, Am. Compl., PageID.228, ¶¶ 63-65), PACE did not issue the written report of its assessment of Dr. Altman until sometime

after September 13, 2018. (R.13, Am. Compl., PageID.223, ¶ 71). According to a letter Dr. Altman sent to Dr. Norcross, the PACE Program Director, dated September 19, 2018, PACE told Dr. Altman on September 6 that the Hospital could call and get Dr. Altman's pass/fail grade by telephone, but the Hospital told Dr. Altman he "could not even initiate any preliminary training programs until the official final report was received" from PACE. This resulted in more than a week of further delay.

Unsurprisingly, the PACE program's assessment of Dr. Altman's fitness for duty simply confirmed what Dr. Abidi and the underwriting insurer's staff had determined back in April of 2018. (R.13, Am. Compl., PageID.229, ¶ 72). But, had Metro Health even cooperated reasonably with Dr. Altman's efforts to complete the PACE program in a timely manner – even setting aside the issue of whether he should have been required to complete it in the first place – Dr. Altman would in all probability have been returned to active duty and eligible for the full $750,000 of life insurance coverage well before the recurrence of his leukemia was diagnosed on September 17, 2018. (R.13, Am. Compl., PageID.229, ¶¶ 73-75).

## III.   ARGUMENT

Defendants have moved the Court to dismiss all counts of Plaintiff's Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  Defendants argue that they are entitled to such relief because the Complaint – despite its subsequent amendment – was pled inadequately such that the Plaintiff cannot demonstrate plausible claims of entitlement to various forms of relief under ERISA, state disability discrimination law, and common law breach of contract.  In truth, however, all claims are pled adequately and plausibly given the context upon which this litigation arises.

This case presents many mysteries which can only be resolved through the discovery process.  This is true primarily due to one central fact:  only two parties know exactly what happened during Dr. Altman's final year of employment with Metro Health – Dr. Altman, and the Defendants.  But Dr. Altman cannot speak, as he tragically passed away after taking painstaking steps to jump through the numerous and unjustified procedural hoops and bureaucracy imposed by Metro Health before it allowed him to return to work after his cancer went into remission, but before it returned months later.  And Defendants are the party seeking leave to remain silent by denying Plaintiff – Dr. Altman's widowed wife and the personal representative of his estate – the opportunity to uncover the whole story through discovery.  This was plainly not the intent of the United States Supreme Court when it decided *Twombley* and *Iqbal*, and for that reason (and those reasons below) the Defendants' Motion to Dismiss should be denied in full.  Defendants may one day be entitled to judgment in their favor, but that day should not come until the parties have all had equal opportunity to explore the truth through discovery.

## A.    Standard of Review

Ms. Altman does not contest Defendants' assertion that the appropriate standard of review to be used by this Court in evaluating this Motion has been defined by the United States Supreme Court in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009).  To that end, in short, Ms. Altman concurs with the Defendants that in order to survive the pending Motion to Dismiss she must "allege facts that state a claim to relief that is plausible on its face and that, if accepted as true, are sufficient to raise a right to relief above the speculative level."

*Bickerstaff v. Lucarelli,* 830 F.3d 388, 396 (6th Cir. 2016) (internal citations and quotations omitted).  But this standard is misapplied when it results in plausible cases being dismissed before the process of discovery can even begin.  As observed by the Sixth Circuit Court of Appeals:

> Although *Twombly* and *Iqbal* clarified that a complaint must state a plausible claim—not just a possible claim—this Court has cautioned against reading *Twombly* and *Iqbal* so narrowly as to be the death of notice pleading… Plaintiffs do not have to prove their [] claims at this stage.  They only need to allege sufficient 'factual content' from which a court, informed by its 'judicial experience and common sense,' could 'draw the reasonable inference' [of liability]…

> Merely reciting the elements of the cause of action, couched as allegations, will not do.  Such conclusory allegations need not be accepted as true on a motion to dismiss.  Similarly, we have held that factual allegations about discriminatory conduct [in the context of a discrimination lawsuit] that are based on nothing more than a plaintiff's belief are naked assertions devoid of further factual enhancement that are insufficient to state a claim…

> But we also recognize that at this early stage of the proceedings, a plaintiff is not required to set out detailed factual allegations.  Until discovery has begun, the plaintiff simply may not have access to all the facts… A court must engage in a "context-specific" analysis of the plausibility of the plaintiff's claims.  In doing so, it should take into account economic or logistical circumstances that prevent the plaintiff from obtaining evidence supporting his claim and adjust the plausibility threshold appropriately to account for these difficulties.

*El-Hallani v. Huntington Nat. Bank,* 623 Fed. Appx. 730, 734-35 (6th Cir. 2015).

### B.  Ms. Altman has brought plausible, properly pled claims under 29 USC 1132(a)(1)(B) and 1132(a)(3).

Plaintiff brings claims under 29 USC 1132(a)(1)(B) and 29 USC 1132(a)(3) against Defendants, arguing that Dr. Altman was improperly denied benefits to which he was entitled under the Metro Health Hospital Employee Benefit Plan ("the Plan").  The Defendants have asked the Court to dismiss these claims on three

independent grounds:  first, that Plaintiff never applied for life insurance benefits under the Plan; second, that Plaintiff failed to take advantage of internal appeal procedures and thus insufficiently exhausted administrative remedies prior to bringing her claim; and third, with respect to the 1132(a)(3) claim only, that this claim is merely duplicative of the 1132(a)(1)(B) claim.

Plaintiff and Defendants are talking past each other with respect to these claims.  Although Defendants have articulated persuasive arguments explaining why Ms. Altman was not eligible to receive as Dr. Altman's beneficiary certain life insurance benefits to which he would have been entitled under the Plan at the time Dr. Altman passed away, Plaintiff's claim is distinct and instead explains that Dr. Altman was inappropriately denied "waiver of premium" continuation coverage during his life – a benefit for which he was at one time eligible and for which the Plan subsequently determined he had lost eligibility at the time when he submitted his medical documentation proving he was fit to return to work.

The distinction is meaningful and nullifies Defendants arguments for why Ms. Altman's 1132 claims should be dismissed.  As pled in Ms. Altman's Amended Complaint, Dr. Altman applied for and was approved to receive "waiver of premium" coverage on April 20, 2017, during the period of time when Dr. Altman could not work because of the then-debilitating effects of the treatment of his cancer.  (R.13, Am. Compl., PageID.223).  This waiver of premium coverage was essential because it allowed Dr. Altman to maintain his group life insurance benefits despite his absence from work on medical leave, and despite Metro Health's lack of any obligation to pay

8

Dr. Altman's premiums for the benefit on his behalf during Dr. Altman's period of work-related "disability" – the status upon which Dr. Altman's eligibility for waiver of premium continuation coverage relied.  In other words, under the terms of the Plan, Dr. Altman would continue to be eligible for this coverage for as long as he remained disabled and unable to work.  This meant that had Dr. Altman passed away during his first course of treatment and never entered a period of remission from his cancer, Dr. Altman would have received full group life insurance benefits upon his death (which would have passed to Ms. Altman, his beneficiary).  These benefits were worth $750,000.00 – a very sizable sum.

But the Plan terminated Dr. Altman's waiver of premium coverage on April 19, 2018, and it memorialized this decision by sending a letter to Metro Health and Dr. Altman explaining that following review of his medical records by "a Waiver Specialist, a Nurse Case Manager, a Medical Director Board Certified in Internal Medicine, Hematology, and Medical Oncology, and a Rehabilitation Specialist," those professionals had advised the Plan and the Plan had accordingly decided that he was no longer disabled and accordingly was no longer eligible for the waiver of premium group life insurance extension coverage.  (R.13, Am. Compl., PageID.224).  The Plan determined, in other words, that Dr. Altman could return to work as a clinical neurologist.  (*Id.*).

At the time the Plan announced this decision (that is, April 19, 2018), Dr. Altman had no reason to protest.  After all, his own physician would independently issue an identical assessment of Dr. Altman's medical condition and his ability to

9

return to work on April 26, 2018, just one week after the Plan issued its own decision determining that Dr. Altman was no longer disabled.      (R.13, Am. Compl., PageID.223).  Dr. Altman promptly submitted his return-to-work notice to Metro Health and expected to be diligently on-boarded back to practicing the profession he loved.  What would cause him to suspect otherwise?  After all, both his own physician and the Plan's entire medical review board agreed – as of the end of April, Dr. Altman was no longer disabled and was ready to return to work.

But Dr. Altman's Section 1132 claims start to come into focus shortly thereafter.  On May 8, 2018, approximately one week after Dr. Altman triumphantly provided Metro Health with his return-to-work clearance, Metro Health informed Dr. Altman that he had not yet been assigned a return-to-work date. (R.13, Am. Compl., PageID.224).   In retrospect, this was an ominous sign.   Indeed, Metro Health informed Dr. Altman for the first time within that same week that it would not be following his physician's recommendations or making a decision consistent with the Plan's assessment but would instead require him to perform a fitness for duty exam prior to returning to work.  (*Id.*).  Dr. Altman protested – he'd only been away from work for nineteen months at that time, a length similar to the duration of sabbaticals taken by many overworked physicians working for hospitals and small practices across the country.  There was no reason to doubt his competency, as his leukemia had attacked his bone marrow, not his mind.  And, in any event, the inconsistency rankled – the physician who had personally treated Dr. Altman felt he could work again, and a team of medical professionals employed by the Plan felt he could work

10

again, but Metro Health's HR team apparently felt differently based on no evidence at all.

As pled in the Plaintiff's Amended Complaint, Dr. Altman protested numerous times and asked Metro Health's administration to reverse either their decision to delay his return to work or to work to reverse the Plan's decision about the waiver of premium coverage. (R.13, Am. Compl., PageID.225).  But Metro Health informed him that he had no ability to change either outcome, leaving Dr. Altman to (understandably) conclude that further appeals or protests were futile if they were available to him at all.  (*Id.*).  As these pled facts show, Dr. Altman was in a state of limbo between the week of May 8, 2018 (the approximate date Metro Health told him that he could not return to work until he had passed a fitness for duty exam) and September 13, 2018 (the date when the PACE Program finally provided Metro Health with its own assessment of Dr. Altman's ability to return to work – an assessment both the Plan's medical team and Dr. Altman's own doctor had provided to Metro Health four full months earlier).  The Plan concluded that Dr. Altman was too healthy to receive waiver of premium coverage at the same time Metro Health concluded that Dr. Altman was too sick to work.

Dr. Altman's Section 1132 claims arise from this patent inconsistency.  The claims function as an alternative theory of liability to Dr. Altman's PWDCRA claims, which are discussed below.  In bringing these claims together in the same lawsuit, Plaintiff argues that either Dr. Altman experienced a "work-related disability" as of the beginning of May of 2018 or he did not.  He was either well enough to work, or

sick enough to be eligible for waiver of premium group life insurance coverage. Plaintiff believes (prior to learning new facts through the benefit of discovery) that the Plan's assessment was correct, as that assessment matches the assessment of Dr. Altman's own physician and the assessment the PACE Program would eventually reach after four bumbling, delay-filled months.  If facts to support this assertion emerge through discovery, Plaintiff freely concedes that the Defendants will then, but only then, likely become entitled to summary judgment on the Section 1132 claims. But if it instead becomes clear that Metro Health's assessment of the uncertainty of Dr. Altman's condition as of May of 2018 proves to be justified and supported by persuasive evidence, then the Plan's denial of Dr. Altman's extension of premium coverage becomes an improper denial of Plan benefits, thus entitling Plaintiff to relief.

Because Defendants have failed to address the proper theory of liability with respect to the waiver of premium coverage, and because the Amended Complaint's pled facts show that Dr. Altman applied for waiver of premium coverage, was approved for coverage, was later determined ineligible for coverage, and attempted futilely to protest that denial, Plaintiff's Amended Complaint states sufficient facts to survive Defendants' Motion to Dismiss concerning the Section 1132(a)(1)(B) and 1132(a)(3) claims.  These claims – like the rest of this case – will be best served by proceeding to discovery so all parties can get more clarity about what happened and why in Dr. Altman's final year of life.

**C. Ms. Altman has brought plausible, properly pled claims under Michigan's Persons With Disabilities Civil Rights Act (MCL 37.1202 *et seq.*).**

Through their Motion, Defendants argue that Ms. Altman's claims under the Michigan Persons with Disabilities Civil Rights Act, MCL 37.1202 *et seq.* ("PWDCRA") should be dismissed for a failure to state a claim on two separate grounds.  First, Defendants argue Ms. Altman has failed to bring a PWDCRA claim on her deceased husband's behalf because she has allegedly failed to plead facts to support that Dr. Altman was "disabled" as that term is defined by the PWDCRA,[1] or that Defendants regarded him as disabled under the PWDCRA.  (R.14, Brief, PageID.19-24).   Second, Defendants argue that Ms. Altman's claims must be dismissed because Dr. Altman was not subjected to any adverse employment action by being denied the opportunity to return to work without being subjected to examination through the PACE Program.  (R.14, Brief, PageID.19-24; 24-25).  In each instance, however, Defendants' arguments rely on inferences which are presently unsupported by an undeveloped record, and accordingly this Court should deny Defendants' request to dismiss these claims.

---

[1] Although Plaintiff's research has found no published case in which a Michigan court has concluded that cancer *per se* represents a disability under the PWDCRA, many courts have held that cancer represents a disability under the ADA.  *See, e.g., Darby v. Childvine, Inc.,* 964 F.3d 440 (6th Cir. 2020) (holding that cancer qualifies *per se* as condition substantially limiting a major life activity and denying 12(b)(6) motion in the context of holding non-cancerous cell growth disease would also qualify). And the ADA and the PWDCRA "substantially mirror[]" each other.  *Donald v. Sybra, Inc.,* 667 F.3d 757, 763-64 (6th Cir. 2012).  In any event, the Amended Complaint contains the allegation that Dr. Altman's myelogenous leukemia "substantially affected many of his life activities, including his ability to perform his ordinary and customary activities of daily living."  (R.13, Brief, PageID.222).

1.   **The record is insufficiently developed to support any argument Defendants may make based on Dr. Altman's purported consent that Metro Health's decision to subject him to the PACE Program's fitness-for-duty evaluation was job related and consistent with business necessity.**

Defendants argue in their Motion to Dismiss that Ms. Altman's PWDCRA claims must be dismissed because she has allegedly failed to plead an adverse action and independently because she has failed to plead facts to show that Dr. Altman was disabled when Metro Health prohibited him from returning to work until his competency could be evaluated.  But each of these independent arguments rely on a single thin thread of support – the fact that the 2018 Agreement contained a provision by which Dr. Altman "agree[d] and acknowledge[d] that the Contingencies [which included successfully completing the PACE evaluation] identified in this section are job-related and consistent with business necessity, including but not limited to patient safety." (R.14, Brief, PageID.25; 20).

However, Ms. Altman is not sure whether the 2018 Agreement was executed or not, and instead relies only upon her information and belief to support the notion that it might be.  (R.13, Am. Compl., PageID.227).  If it wasn't, perhaps the 2007 Agreement controlled – a fact that, if it is ever to be uncovered, can only be uncovered through discovery.  After all, either Agreement could have been active and pending at the time Dr. Altman attempted to return to work and passed away under their durational terms:  the 2007 Agreement provides that it was intended to auto-renew

for one year periods following the end of the 18-month defined term,[2] and the 2018 Agreement (if it was executed) commenced pursuant to a "Contingency Period" which was slated to begin May 14, 2018, and an "Initial Employment Term" which was to commence "on the first business day following successful completion of the Contingencies set forth in Paragraph 8," which required Dr. Altman to apply for, attend, and successfully complete the PACE Program's fitness-for-duty requirements,[3] which were fulfilled on September 17, 2018 when the PACE Program's staff proclaimed Dr. Altman fit for duty.  (R.13, Am. Compl., PageID.229).  Both Agreements required Metro Health to provide Dr. Altman with certain fringe benefits, including (but not limited to) a group life insurance policy, during their employment terms.[4]  And, upon information belief and as pled in her Amended Complaint, no facts presently available to Ms. Altman at this time indicate that Metro Health made any effort to submit requisite written notice to terminate either Agreement.[5]  Accordingly, relief is hypothetically available to Ms. Altman under either contract.

Notably, however, only the 2018 Agreement contains any language through which Dr. Altman could conceivably have demonstrated his concession that his

---

[2] "The Agreement renews automatically for additional one (1) periods [sic] unless either party gives written notice to the other of their intention not to renew at least ninety days prior to the expiration of the initial employment term or any renewal term."  (R.13-1, Am. Compl. Ex.A, PageID.239 (at Section 8)).

[3] (See R.13-2, Am. Compl. Ex. B, PageID.256 (at Section 8(b)).

[4] (See R.13-1, Am. Compl. Ex. A, PageID.240-241; R.13-2, Am. Compl. Ex. B, PageID.258).

[5] (See R.13-1, Am. Compl. Ex. A, PageID.242-243; R.13-2, Am. Compl. Ex. B, PageID.258-260).

submission to the PACE Program's fitness-for-duty evaluation was either job-related or consistent with business necessity.  (R.13-2, Am. Compl., PageID.256).  This presents a highly material question of fact which is as yet unanswered but which is of paramount importance:  if Dr. Altman and Metro Health executed the 2018 Agreement, Metro Health's arguments in favor of dismissal of Ms. Altman's PWDCRA claim are facially viable (but should ultimately be rejected for the reasons described in the subsections below).  But if, for whatever reason, the 2018 Agreement were never executed before Dr. Altman passed away, Defendants' arguments necessarily fail because they rely upon Dr. Altman's supposed consent to language in an employment agreement he never signed.  But Plaintiff cannot be sure – as explained in her Amended Complaint – whether the 2018 Agreement or the 2007 Agreement controls in this case because she does not know whether Metro Health and Dr. Altman ever mutually executed this Agreement during Dr. Altman's life.  Instead, only Metro Health can answer this question, and discovery will surely reveal the answer.  And because Metro Health's arguments in favor of dismissal of Ms. Altman's Amended Complaint will rise or fall upon this answer, dismissal of her otherwise plausible and fully pled PWDCRA claims is inappropriate prior to the completion of discovery.

**2.** **Even if the developed record proves that the 2018 Agreement controlled Dr. Altman's employment at the time of his death, Plaintiff's Amended Complaint alleges that the Agreement was reached after Metro Health ordered Dr. Altman to attend the PACE Program's fitness for duty test.**

As shown in their Brief, Defendants base their requests for dismissal of Ms. Altman's PDWCRA claims upon Dr. Altman's acknowledgement in the 2018 Agreement that the PACE Program's fitness for duty test was both job-related and consistent with business necessity.   This acknowledgement is "fatal to Plaintiff's [PWDCRA claim]" according to the Defendants because it means that Metro Health breached no statutory duty under the PWDCRA when it required him to receive a clean bill of health from the PACE Program before returning to work despite a clearance to return to work from Dr. Altman's treating physician, as employers are permitted to subject employees to fitness for duty exams should the individual circumstances meet the "job related and consistent with business necessity" standard.  (R.14, Brief, PageID.299, *citing to Gipson v. Tawas Police Authority,* 794 Fed. Appx. 503 (6th Cir. 2019)).  Defendants' argument in this regard suffers from its own "fatal" flaw, however.  As pled by Ms. Altman, Metro Health first informed Dr. Altman during the week of May 8, 2018, that he would not be permitted to return to work before completing an evaluation of his competency.   (R.13, Am. Compl., PageID.224).  But Ms. Altman also pleads in good faith that the 2018 Agreement was not executed until June of 2018, but no later than June 19, 2018.  (R.13, Am. Compl., PageID.227).  This means that Dr. Altman had never, in fact, provided his concession to the job-relatedness and consistency with Metro Health's business necessity of his

completion of the PACE Program's fitness-for-duty test *until after* Metro Health had already informed him in no uncertain terms that his return to work was expressly conditioned upon his acquiescence in that requirement.   (R.13, Am. Compl., PageID.226).   Accordingly, even if Dr. Altman signed the 2018 Agreement, Defendants cannot show that Dr. Altman manifested agreement to attend the PACE Program before he was forced to do so by Metro Health, and thus their arguments in favor of dismissal of Ms. Altman's PWDCRA claims should be denied by this Court.

> **3.    The issue of whether a fitness for duty test is job-related or consistent with business necessity is a question of law for the Court to decide, and Dr. Altman's acknowledgement does not control.**

The PWDCRA, like the ADA, "prohibit[s] an employer from discriminating against a disabled individual by requiring a medical examination that is not shown to be job-related and consistent with business necessity." *Howard v. Michigan Dept. of Corrections,* 2013 WL 2223133, at *8 (Mich. Ct. App. May 21, 2013) (attached as **Exhibit A**).  Defendants do not appear to contest this legal principle, arguing in their Motion that *Gipson v. Tawas Police Authority,* 794 Fed. Appx. 503 (6th Cir. 2019) is "directly on point."  (R.14, Brief, PageID.299).  Plaintiff alleges in her Amended Complaint that Metro Health violated Dr. Altman's rights under the PWDCRA when it refused to return him to work without his successful completion of a fitness for duty examination administered by the PACE Program and despite documentation from Dr. Altman's physician stating that he could safely perform his job as a clinical neurosurgeon once again.   Defendants argue that because the 2018 Agreement contained Dr. Altman's acknowledgement that the PACE Program's test was

job-related and consistent with business necessity, the matter is conclusively resolved.

As a threshold issue, *Gipson* does <u>not</u> stand for the principle that an employee can become bound by a contractual acknowledgement that a medical examination is job related and consistent with business necessity.  In *Gipson,* the plaintiff was a police officer who suffered a back injury in a car accident which caused him to be absent from work for six months.  When he returned to work, the plaintiff's physician prescribed certain limitations as reasonable accommodations.  After the defendant employer accommodated him for one year by conforming his job to these restrictions, the plaintiff needed another four-month medical leave away from work to continue healing.  He returned only pursuant to a physician's note telling the defendant employer that the plaintiff "couldn't perform the full duties required of a policeman, but should be able to perform light duties."  *Gipson v. Tawas Police Authority,* 794 Fed. Appx. at 504.  The employer again accommodated the plaintiff by permitting him to work a light duty-only position for several months, after which the plaintiff asked to be returned to full duty.  The defendant required him to take a "functional capacity exam" as a condition of returning to full duty.  *Id.*  The plaintiff *passed* the exam but returned to work for only a week before he hurt his back once more and went on leave permanently.  *Id.,* at 505.  The plaintiff brought a lawsuit against the defendant under the ADA and PWDCRA alleging that the exam was unreasonable, and the Sixth Circuit Court of Appeals affirmed a grant of summary judgment.

The distinctions between *Gipson* and the instant case are readily apparent and need not be belabored.  *Gipson* was resolved at summary judgment considering a developed record, whereas Defendants have cited it as authority for why this case should be dismissed prior to discovery.  *Gipson* featured an employee who attempted on at least two occasions to return to work before revealing actual objective evidence to his employer that his back would limit his ability to serve as a police officer, whereas here no evidence existed to suggest that Dr. Altman's cancer – then in remission – would prevent him from capably practicing medicine.  The *Gipson* plaintiff's own physician provided the employer with information to suggest that the plaintiff could not perform all the essential functions of his job, whereas in this case Dr. Altman's oncologist cleared him to return to work without restriction.  And most notably, the *Gipson* Court determined the employer was entitled to summary judgment because it concluded that no reasonable dispute of fact existed about whether the exam was "job related and consistent with business necessity" "[b]ased on the evidence on the record," *Id.* at 508, <u>not</u> because the plaintiff had ever signed an agreement containing an acknowledgement that the exam was job related and consistent with business necessity as Defendants argue in this case.  Indeed, as for the last point, *Defendants have cited no authority supporting the proposition that a plaintiff's consent can settle the issue of whether a medical examination is justifiable under the ADA or PWDCRA.*

But Defendants' argument regarding dismissal of the claim should be rejected by the Court for other reasons in addition to the dearth of cited authority.  As the

Sixth Circuit Court of Appeals clearly articulated in *Kroll v. White Lake Ambulance Authority,* 763 F.3d 619, 623 (6th Cir. 2014):

> The employer bears the burden of proving that a medical examination is job-related and consistent with business necessity by demonstrating that: "(1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others." The business-necessity standard cannot be satisfied by an employer's bare assertion that a medical examination was merely convenient or expedient. Rather, the individual who decides to require a medical examination must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business.

(Internal citations omitted). In contrast, a plaintiff's initial threshold burden is merely to "establish[] that he was an employee and that the employer required him to take a medical exam," at which point in time the burden shifts to the employer to show evidence sufficient to persuade the court that any of the above-identified three factors exist. *Gipson,* at 505-06. Ms. Altman's Amended Complaint contains allegations that Metro Health required Dr. Altman to take a fitness for duty test before returning to work and that he was an employee of Metro Health when that demand was made, thus meeting the threshold pleading standard. Defendants very well may prevail on their claim after a record has been developed, but they cannot sustain their burden based on the pleadings alone. Accordingly, their Motion to Dismiss Ms. Altman's PWDCRA claims must be denied so that the parties can develop the record through discovery.

### D. Ms. Altman has brought properly pled claims alleging a breach of contract on the part of Defendants.

Plaintiff's Amended Complaint includes a breach of contract claim, and Defendants have asked this Court to dismiss it. In oversimplified summary, Ms.

Altman has pled that Dr. Altman had an employment agreement with Metro Health – believed to be the 2018 Agreement, although she is unsure – which provided that Dr. Altman's performance pursuant to the Agreement entitled him to receive from Metro Health certain monetary and other benefits upon the commencement of his "Initial Employment Term" and that Metro Health failed to provide him the promised benefits upon commencement of that Initial Employment Term.  Defendants, by and through their Motion, do not contest the existence of a contract of employment between Dr. Altman and Metro Health.  Nor does their Brief evince any intent to contest that Metro Health never in fact paid or provided Dr. Altman with those specific benefits to which he should have been entitled under the Agreement.  Instead, Defendants argue that Ms. Altman has failed to adequately plead the existence of a breach on the part of Metro Health.

Although discovery may eventually reveal facts to disprove Ms. Altman's allegations as they are pled, a review of the 2018 Agreement's actual terms demonstrates that her claim is at least plausible.  Sections 8 and 9 of the Agreement create a two-step employment process for Dr. Altman, intended (albeit unnecessarily and in contravention of his doctor's orders, as argued above) to slowly transition Dr. Altman back to work.  (R.13-2, Am. Compl. Ex. B, PageID.256-258).  Section 8(b) provides that Dr. Altman will enter a "Contingency Period" of employment effective May 14, 2018, which is defined to end upon "the date [Metro Health] receives notice of [Dr. Altman's] results from the PACE Program Fitness for Duty and Competency Evaluation," presumably initiating the Initial Employment Term provided by Section

9.  (R.13-2, Am. Compl. Ex. B, PageID.256).   Section 9 provides, perhaps inconsistently, that Dr. Altman's Initial Employment Term will begin "the first business day following the successful completion of the Contingencies set forth in Paragraph 8."  (R.13-2, Am. Compl. Ex. B, PageID.257).   Section 8(a) lists the three contingencies, which are (in summary) that (i) Dr. Altman will "apply for and participate in" the PACE Program's fitness test and will "successful clearance" based on the Program's evaluation; (ii) Dr. Altman will complete any "applicable medical staff requirements;" and (iii) Dr. Altman will "respond to requests for information concerning work-related restrictions."  (R.13-2, Am. Compl. Ex. B, PageID.256).

The Amended Complaint tells the story from there.  Dr. Altman fulfilled the third condition by providing Metro Health on April 26, 2018, with his physician's return-to-work clearance (subject to certain minor work restrictions) effective May 14, 2018.  (R.13, Am. Compl., PageID.223).  On or around May 18, 2018 (inexplicably before Dr. Altman and Metro Health are believed to have executed the 2018 Agreement), Dr. Altman was informed by Metro Health that he would be required to receive a successful evaluation from the PACE Program's test.  (R.13, Am. Compl., PageID.225).  On May 20, 2018, Dr. Altman applied to be tested by the PACE Program.  (R.13, Am. Compl., PageID.226).  After months of folly and error between the PACE Program and Metro Health,[6] Dr. Altman participated until completion in the PACE Program's test on July 24, 26, and 27 of 2018.  (R.13, Am. Compl.,

---

[6] Defendants allege in their Motion that the significant delays which plagued Dr. Altman's return to work process were the fault of the PACE Program, not Metro Health.  Perhaps this is so.  But if it is, these facts should be revealed through discovery and summary judgment represents the appropriate stage to resolve these concerns.

PageID.228).  On or about September 13, 2018, Metro Health received notice of Dr. Altman's successful completion of the PACE Program's tests, which provided Dr. Altman the highest possible grade and declared him fit for duty, thus completing the first condition.  (R.13, Am. Compl., PageID.229).  Finally, Metro Health never imposed any demands upon Dr. Altman concerning any "applicable staff medical requirements," thus failing to implicate the second condition.  As alleged in Ms. Altman's Amended Complaint, this means that Dr. Altman's Initial Employment Term began on or about September 14, 2018 – the "first business day" following completion of all three contingencies and the day following conclusion of the Contingency Period – under Sections 8(b) and 9(a) of the 2018 Agreement. Accordingly and as pled, Dr. Altman was entitled to receive all compensation and benefits owed to him under Section 10 of the 2018 Agreement beginning September 14, 2018.

But Metro Health never returned Dr. Altman to work, and never regarded him as eligible to receive the compensation and other benefits described in Section 10. (R.13, Am. Compl., PageID.235-236).  It is here that Ms. Altman argues upon information and good-faith belief that Metro Health breached the Agreement. Accordingly, Ms. Altman (the beneficiary of Dr. Altman's benefit plans) was damaged by Metro Health because it nevertheless advanced Dr. Altman's employment status, thus rendering him ineligible for certain benefits Metro Health had promised to provide to Dr. Altman upon commencement of the Initial Employment Term. Likewise, it is here where Dr. Altman (and Ms. Altman as his beneficiary) were

damaged by Metro Health's contractual breach.  Defendants' Motion to Dismiss does not even address this breach theory although the Amended Complaint pled facts sufficient to support it, and accordingly the Court should deny the Motion with respect to these claims.

In arguing that this breach of contract claim should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6), Defendants misconstrue Ms. Altman's theory of liability and minimize the impact of the alleged breach.  Defendants focus, for example, on Metro Health's inexplicable refusal to pay for Dr. Altman's evaluation after the PACE Program incorrectly billed Dr. Altman directly, arguing that the "approximately two weeks" between Dr. Altman's submission of the bill and Metro Health's reversal of its initial payment denial was effectively *de minimis*.  But even if this was the sole breach pled by Ms. Altman, it is a breach nevertheless until Metro Health remedied it.  And the delay may have, in fact, proven costly – the true ramifications of this delay cannot be known to Ms. Altman unless and until she is able to receive additional information in discovery.  The Court should decline to dismiss Ms. Altman's breach of contract claims so prematurely and should instead consider a developed record in the event Defendants move the Court for summary judgment at a later date.

### E.    Ms. Altman has brought properly pled claims under 29 USC 1140.

Defendants also ask the Court to dismiss Plaintiff's claim under 29 USC 1140 ("Section 510"), which is the portion of ERISA which prohibits an employer from taking adverse employment actions against an employee "for the purpose of interfering with the attainment of any right to which such participant may become entitled to under the plan[.]"  The elements of a § 510 claim require the plaintiff to

demonstrate that "(1) he was engaged in an activity that ERISA protects; (2) he suffered an adverse employment action; and (3) a causal link exists between his protected activity and the employer's adverse action." *Williams v. Graphic Packaging Int'l, Inc.*, 790 Fed.Appx. 745, 754-55 (6th Cir. 2019) (internal quotations omitted). Further, "the Sixth Circuit has recognized two different kinds of claims under Section 1140 [ERISA § 510]: (1) a retaliation claim where adverse action is taken because a participant availed [him]self of an ERISA right; and (2) an interference claim where an adverse action is taken as interference with the attainment of a right under ERISA." *Id.* at 755. In the Amended Complaint, Plaintiff alleges that Metro Health subjected Dr. Altman to an adverse action (i.e. failure to return him to work in a timely and lawful fashion) for the purpose of interfering with Dr. Altman's right to obtain certain welfare benefits which Metro Health was required to provide to him under the terms of either the 2007 Agreement or the 2018 Agreement including (but not limited to) a generous group life insurance policy. (R.13, Am. Compl., PageID.225; 232).   Defendants argue that this claim should be dismissed because Dr. Altman cannot identify any adverse action[7] to which Metro Health subjected him.   (R.14, Brief, PageID.305-307).

This is untrue.  Plaintiff's Amended Complaint contains the following specific allegations:  (1) that Defendants "knowingly, repeatedly, arbitrarily, and capriciously

---

[7] Defendants also rely on an argument based on Dr. Altman's purported acknowledgement of the job relatedness and consistency with business necessity of the PACE Program's fitness for duty test to undermine the existence of an adverse action for the purposes of Plaintiff's Section 510 claim.  This argument should be rejected for those same reasons as articulated in Argument Sections C.1-3 above, which apply with equal strength here.

delayed Dr. Altman's new return-to-work date for the purpose of interfering with his ability to receive rights to which he may have become entitled under the Plan as an active employee;" (2) that Defendants "intentionally delayed Dr. Altman's return-to-work date for the purpose of interfering with his and Plaintiff's attainment of benefits under the Plan;" and (3) that Defendants "deliberately discriminated against Dr. Altman for the purpose of interfering with his and Plaintiff's rights under the Plan." These specific allegations are materially similar to those identified as sufficient to defeat a defendant employer's motion to dismiss a Section 510 interference claim in *Scarcello v. Tenneco Automotive Operating Company, Inc.,* 2021 WL 3473229 (E.D. Mich. Aug. 6, 2021) (attached as **Exhibit B**).  And just as the *Scarcello* Court concluded in that case, "[s]ave for finding specific allegations that can only be found in discovery, these allegations sufficiently and plausibly allege a Section 510 violation" such that the plaintiff survived the defendant's motion to dismiss.  The Court should decline to dismiss Plaintiff's Section 510 claims for the same reason.

## IV.    CONCLUSION

For the reasons set forth above, the Court should deny the Defendants' Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) and allow the parties to proceed to discovery.

Respectfully Submitted,
FISHER & DICKINSON P.C.

Dated: May 17, 2022                          By  /s/ Todd R. Dickinson
                                                        Todd R. Dickinson (P30876)
                                                  Attorneys for Plaintiff
                                                  678 Front Avenue NW, Suite 360
                                                  Grand Rapids, MI  49504
                                                  616-575-5655
                                                  trd@fisher-dickinson.com

27

### Certificate of Compliance

Undersigned counsel hereby certifies that this Brief complies with W.D. Mich. L. Civ. R. 7.2(b)(1) because the word count, as determined by Microsoft Word for Microsoft 365 MSO (Version 2204 Build 16.0.15128.20210) 64-bit, is 7,495 words, and therefore does not exceed 10,800 words, including headings, footnotes, citations, and quotations, but not including the case caption, cover sheets, table of contents, table of authorities, signature block, attachments, exhibits, or affidavits.

FISHER & DICKINSON P.C.

Dated: May 17, 2022

By  /s/ Todd R. Dickinson
    Todd R. Dickinson (P30876)
Attorneys for Plaintiff
678 Front Avenue NW, Suite 360
Grand Rapids, MI  49504
616-575-5655
trd@fisher-dickinson.com