UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHERYLYNNE E. ALTMAN,

     Plaintiff,

v.

UM HEALTH, et al.,

     Defendants.

_____/

Case No. 1:22-cv-98

HON. JANE M. BECKERING

## OPINION AND ORDER

Plaintiff Cherylynne E. Altman initiated this case as the beneficiary and Personal Representative of the Estate of Dr. Kevin C. Altman, her deceased husband, pursuant to the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq*. Pending before the Court is a Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 14), filed by Defendants UM Health, Metropolitan Hospital ("Metro Health"), Metro Health Hospital Employee Benefit Plan (the "Plan") (collectively, "Defendants"). Having considered the parties' submissions, the Court concludes that oral argument is not necessary to resolve the issues presented. *See* W.D. Mich. LCivR 7.2(d). For the reasons that follow, Defendant's motion is granted in part and denied in part.

## I. BACKGROUND

### A. Factual Background

Dr. Altman, a clinical neurologist, was employed by Defendant Metro Health beginning around January 2008 (Am. Compl. [ECF No. 10, corrected by 13] ¶¶ 9, 15). Dr. Altman was diagnosed with myelogenous leukemia in or around September 2016 (*id.* at ¶ 21). This action

arises from Dr. Altman's employment with Metro Health—during his illness and before he passed away on November 2, 2018—and his qualification for and entitlement to benefits under various employee health and welfare benefit plans offered by his employer, including a group term life insurance policy, available as part of the Plan (*id.* ¶¶ 10–11, 86).

Dr. Altman's employment was governed by a 2008–2010 employment agreement (the "2008 Agreement") he executed with Metro Health at the time of his hire (Am. Compl. ¶ 16; *see* Ex. A to Am. Compl., [ECF No. 13-1]). The 2008 Agreement "contained a durational term" of January 1, 2008 through June 30, 2010, and was "renewable upon one-year terms thereafter pending notice between the parties" (*id.* ¶ 17) (citing Ex. A to Am. Compl. at 3, Sec. 8). The 2008 Agreement defined the terms and conditions of Dr. Altman's employment, including compensation and benefits for services provided as a physician, as well as certain enumerated insurance benefits, such as group life term insurance (*id.* ¶¶ 18–20). Specifically, Section 11(a)(iv) of the 2008 Agreement "provided that Metro Health 'will provide [Dr. Altman] with group life term insurance, in an amount equal to two times [Dr. Altman's] Annual Salary provided [Dr. Altman] qualifies for participation under [Metro Health's] group policy'" (*id.* ¶ 19) (quoting Ex. A to Am. Compl. at 4–5, Sec. 11). Plaintiff alleges that Dr. Altman qualified for participation under Metro Health's group life term insurance policy "as provided by the Plan or otherwise" (*id.* ¶ 20).

In or around September 2016, Dr. Altman was diagnosed with myelogenous leukemia, a "relatively uncommon form of blood-cell cancer which viciously attacks the bone marrow" (Am. Compl. ¶ 21). According to Plaintiff, Dr. Altman's leukemia "substantially affected many of his life activities," including his "ability to perform his ordinary and customary activities" of his daily life, and "[f]or a time," his ability to work (*id.* ¶ 22). Following his diagnosis, Dr. Altman requested and was granted leave from Metro Health pursuant to the Family and Medical Leave Act

("FMLA") (*id.* ¶ 23).   On December 22, 2016, Metro Health informed Dr. Altman that his eligibility for FMLA leave was exhausted "effective December 19, 2016" and that Dr. Altman's "benefits with Metro Health would be terminated effective January 19, 2017" (*id.* ¶ 24).   On December 29, 2016, Dr. Altman applied for a period of non-FMLA medical leave to be effective retroactively from December 20, 2016 while awaiting a bone marrow transplant (*id.* ¶ 25).   Dr. Altman also underwent an "allogenic stem cell transplant" on February 17, 2017 that required a lengthy recovery process which Plaintiff alleges also substantially affected his life and, for a time, his ability to work (*id.* ¶¶ 26–27).

According to Plaintiff, on April 20, 2017, a representative of the Plan contacted Metro Health to inform them that Dr. Altman was approved for "waiver of premium" coverage with respect to the group life insurance coverage available under the Plan, effective March 27, 2017 (Am. Compl. ¶ 28).   Dr. Altman received notice of the premium waiver, which allowed him to continue his group life insurance coverage during his period of recovery (*id.* ¶ 29).

On April 26, 2018, Dr. Altman's treating physician provided a letter to Dr. Altman, stating that it was his physician's opinion that Dr. Altman was "ready to return to work with certain limited restrictions effective May 14, 2018" (Am. Compl. ¶ 30).   Plaintiff alleges that Dr. Altman provided Metro Health with this return-to-work notice "the same day" and that Dr. Altman planned to return to work "as soon as possible" (*id.*).   Plaintiff alleges that, "[f]rom Dr. Altman's perspective, as of April of 2018, the lingering symptoms from his treatment and his illness substantially affected certain life activities limiting his personal life and recreation, but no longer affected his ability to perform the essential functions of his job" (*id.* ¶ 31).

However, Metro Health's human resources department informed Dr. Altman "later that same week" that he could only return to work on the completion of "an evaluation of his

competency" (Am. Compl. ¶ 33). Plaintiff alleges that Dr. Altman "opposed Metro Health's position" regarding his fitness to return to work because Dr. Altman, his physician, and the Plan felt his illness or treatment "no longer affected Dr. Altman's ability to perform essential functions of his job" (*id.* ¶¶ 35–36). Plaintiff alleges that Dr. Altman requested a review of his case by Metro Health's medical staff, instead of human resources, but was unsuccessful (*id.* ¶ 37). Plaintiff states that Metro Health informed Dr. Altman he was no longer eligible to receive group life coverage with the aforementioned premium waiver "because, from the Plan's perspective, his period of disability had ended as of April 19, 2018" (*id.*).

However, Plaintiff also alleges that, on April 19, 2018, the Plan sent "correspondence" to both Dr. Altman and Metro Health—following review of Dr. Altman's "medical records and other case history" by medical staff, specifically a Waiver Specialist, a Nurse Case Manager, a Medical Director, and a Rehabilitation Specialist—concluding that Dr. Altman was "physically and mentally ready to return to work as a neurologist and a consultant" (Am. Compl. ¶ 38).

Plaintiff alleges that Metro Health "disregarded" his treating physician's assessment, his own assessment, and the Plan's assessment of his ability to perform the essential functions of his job "without explaining its refusal to accept those assessments," and insisted on Dr. Altman's completion of a competency evaluation prior to returning to work (Am. Compl. ¶ 39). In the meantime, Dr. Altman converted his group life policy benefits to a smaller personal life insurance policy with self-paid premiums (*id.* ¶ 40). Plaintiff alleges that Dr. Altman was "[d]eeply unsatisfied" with this outcome but felt "further protests would be futile" (*id.*).

"On or near Dr. Altman's return to work date," Metro Health directed Dr. Altman that the competency evaluation would be performed by the Physician Assessment and Clinical Education

("PACE") Program (Am. Compl. ¶ 42).[1]  Dr. Altman attempted to raise to Metro Health that he was being sent to the evaluation in error because he felt the evaluation was not "job-related" nor "consistent with Metro Health's business necessity" (*id.* ¶¶ 46–47).   According to Plaintiff, Dr. Altman's concerns "did not alter" Metro Health's decision that Dr. Altman would need to complete the evaluation, such that he felt further protest was "futile" (*id.*).   Dr. Altman completed the application for the PACE Program on May 20, 2018, and, upon Dr. William A. Norcross' (the PACE Program Director)'s request, sent a letter clarifying the scope of his practice on June 19, 2018 for his participation in the program (*id.* ¶¶ 48, 50).

Plaintiff alleges that Metro Health sent Dr. Altman "a new draft employment agreement" in June 2018 (the "2018 Agreement") that was similar to the 2008 Agreement in terms of compensation, benefits, and group term life insurance policy "in an amount equal to three times [Dr. Altman's] annual salary" at the onset of his "Employment Term" (Am. Compl. ¶¶ 51–52; Ex. B to Am. Compl. [ECF No. 13-2] at 4–5 and 16, Sec. 10(c) and internal Exhibit C(a)(iv)).  The 2018 Agreement provided that Dr. Altman's "Employment Term" would begin when the following contingencies (as set forth under "Contingency Period") were met:

a. Dr. Altman apply for, participate, and receive a "successful clearance" by the PACE Program, with "all program/evaluation costs" to be paid by the Hospital;

b. Dr. Altman successfully complete "any applicable medical staff requirements, including but not limited to Focused Professional Practice Evaluation ('FPPE') and/or Ongoing Professional Practice Evaluation ("OPPE") processes;" and

---

[1] The PACE Program is affiliated with or operated by the University of California – San Diego School of Medicine (Am. Compl. ¶ 43).  Plaintiff references a 2010 Wall Street Journal article that explained that the "primary mission of PACE is to evaluate the competence of doctors whose infractions range from serious medical error and negligence to sloppy record keeping and anger management" (*id.* ¶ 44).  According to Plaintiff, at no time during Dr. Altman's practice as a physician had he committed serious medical error, medical negligence, or exhibited poor record-keeping or anger management problems (*id.* ¶ 45).

c. Dr. Altman "shall respond to requests for information concerning work related restrictions" and inform Metro Health of any such restrictions.

(*id.* ¶ 53) (quoting Ex. B to Am. Compl. at 3, Sec 8). Further, the 2018 Agreement provided that "[t]he Contingency Period shall commence May 14, 2018, and run through the date [the] Hospital receives notice of [Dr. Altman's] results from the PACE Program" (Ex. B to Am. Compl. at 3, Sec 8(b)). In turn, the "Employment Term" or "Initial Employment Term" commenced "on the first business day following the successful completion of the Contingencies set forth in paragraph 8 …" (*id.* at 4, Sec. 9(a)).

Plaintiff alleges that Dr. Altman and Metro Health "mutually executed" the 2018 Agreement "during or around June of 2018, but not before June 19, 2018" (Am. Compl. ¶ 55). On June 29, 2018, the PACE Program billed Dr. Altman $13,200 for payment of the evaluation but did not include details as to when the evaluation would be scheduled until receipt of payment (*id.* ¶¶ 56–58). Dr. Altman raised the issue of payment with Metro Health—who "held the obligation to pay for Dr. Altman's evaluation (Ex. B at 3, Sec. 8(a)(1))"—and Metro Health "agreed to remedy the situation" (*id.* ¶ 59). On July 10, 2018, Dr. Altman notified Metro Health that the PACE Program informed him that no payment had been made (*id.* ¶ 60). Dr. Altman followed up to schedule his evaluations, but on July 16, 2018, he was informed that only one of two PACE Program invoices had been paid by Metro Health (*id.* ¶ 61). Plaintiff alleges that Metro Health remedied the situation "some time after July 16, 2018" (*id.* ¶ 62).

Dr. Altman was registered for the July 24, 2018 PACE Program and flew to San Diego to complete all tests before returning to Grand Rapids (Am. Compl. ¶¶ 63–67). Dr. Altman followed up to inquire about his evaluation results on August 24, 2018 and was told the report was not completed (*id.* ¶ 69). On September 13, 2018, the PACE Program told Dr. Altman that the "report was incomplete but would be disbursed to Metro Health the next day" (*id.* ¶ 70). "[A]t some point

subsequent to September 13, 2018[,]" the PACE Program disbursed a report of Dr. Altman's competency dated September 12, 2018, which issued a "Pass – Category 1" (the highest rating) and declared Dr. Altman "FIT FOR DUTY" (*id.* ¶¶ 71–72). On September 17, 2018, Metro Health was informed that Dr. Altman passed the PACE Program's evaluation and was considered fit for duty (*id.* ¶ 74).

That same day, Dr. Altman went in for a routine biopsy screening to check the status of his leukemia's remission and was informed by his physician that his cancer had returned (Am. Compl. ¶¶ 73, 75). Dr. Altman was hospitalized on September 19, 2018 (*id.* ¶ 76). Metro Health provided Dr. Altman a non-FMLA Leave of Absence on October 2, 2018, for a period between September 20, 2018 and September 20, 2019, although Metro Health "subsequently confirmed that Dr. Altman was considered an active employee at this time" (*id.* ¶ 77).

According to Plaintiff, on September 19, 2018, Dr. Altman sent a letter to the PACE Program's Director complaining about the delays in his evaluation and written report (Am. Compl. ¶ 76). On November 19, 2018, Dr. Norcross responded to Dr. Altman's letter, which: (i) detailed the PACE Program's view of the misunderstanding and "confusion regarding who would pay" for the evaluation that led to a delay in scheduling Dr. Altman's evaluation; (ii) stated that the "7 week wait" that Dr. Altman experienced in the PACE Program's completion of the written report was "not too far off [PACE's] average"; and (iii) stated that Dr. Altman "passed [the] examination with a globally outstanding performance" (*id.* ¶¶ 78–83).

Dr. Altman passed away on November 2, 2018 (Am. Compl. ¶ 86).

## B. Procedural Posture

Plaintiff initiated this action on February 1, 2022. On March 28, 2022, on leave granted, Plaintiff filed an Amended Complaint (ECF No. 10). Plaintiff asserts the following counts:

I.      ERISA § 502(A)(1)(B) (29 U.S.C. § 1132(a)(1)(B)) (Against All Defendants)
II.     ERISA § 510 (29 U.S.C. § 1140) (Against Defendants UM Health and Metro Health)
III.    ERISA § 502(A)(3) (29 U.S.C. § 1132(a)(3)) (Against All Defendants)
IV.     Michigan's Persons with Disabilities Civil Rights Act (MPWDCRA), MICH. COMP. LAWS § 37.1201 (Against Defendants UM Health and Metro Health)
V.      Breach of Contract (Against Defendants UM Health and Metro Health)

Defendants filed the instant motion to dismiss (ECF No. 14) on April 12, 2022 (ECF No. 14), to which Plaintiff filed a response in opposition (ECF No. 17), and Defendants filed a reply (ECF No. 20).

## II.  ANALYSIS

### A.  Motion Standard

Federal Rule of Civil Procedure 12(b)(6) authorizes the court to dismiss a claim for relief in any pleading if the claim "fail[s] to state a claim upon which relief can be granted[.]" FED. R. CIV. P. 12(b)(6).  To survive a motion to dismiss, a complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In deciding a motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the non-movant and accept all well-pleaded factual

allegations in the complaint as true. *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

When considering a motion to dismiss for failure to state a claim, the Court generally does not consider matters outside the pleadings unless the Court treats the motion as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016); *see also* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) … , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). Where, as here, there are "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss," the Court may consider them without converting the motion to one for summary judgment "so long as they are referred to in the complaint and are central to the claims contained therein[.]" *Gavitt, supra.*

## B. Discussion

### 1. Count I & Count III (29 U.S.C. §§ 1132(a)(1)(B) and 1132(a)(3))

Defendants argue that Plaintiff fails to plead a claim for unpaid benefits under § 1132(a)(1)(B) because: (1) Plaintiff never applied for benefits under the Plan; (2) Plaintiff failed to exhaust administrative remedies prior to bringing her suit; and (3) Plaintiff's § 1132(a)(3) claim is duplicative of her § 1132(a)(1)(B) claim (ECF No. 14 at PageID.289–295).

First, Defendants contend that an application for benefits is a prerequisite and Plaintiff does not allege that she ever applied for or requested life insurance benefits after Dr. Altman passed away (*id.* at PageID.291). Defendants also state that because the life insurance benefits under the Plan "were fully-insured by CIGNA, not self-funded by Defendants," any application would have

to have been made to CIGNA, "which had sole discretion and authority to determine whether to pay, or deny, life insurance benefits" (*id.*) (citing Plan at 37).

Second, Defendants also argue that Plaintiff failed to exhaust administrative remedies and "allege[s no] facts clearly and positively showing that exhaustion would have been futile" (*id.* at PageID.291–292, 294) (citing Plan at 26–33, 37; Am. Compl. ¶ 93; and *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499 (6th Cir. 2004) ("Although ERISA is silent as to whether exhaustion of administrative remedies is a prerequisite to bringing a civil action, we have held that "[t]he administrative scheme of ERISA requires a participant to exhaust his or her administrative remedies prior to commencing suit in federal court.").

Third, Defendants argue that Plaintiff's claim under Count III is a "repackaged … claim for benefits" as asserted in Count I that "allege[s] identical injury and identical relief" (ECF No. 14 at PageID.294–295). Defendants also argue that Count III should be dismissed for Plaintiff's failure to exhaust administrative remedies (*id.* at PageID.295).

In response, Plaintiff contends that "Plaintiff's claim is distinct" in that Plaintiff alleges that Dr. Altman applied and was approved for, and then was later "inappropriately denied 'waiver of premium' continuation coverage"—not life insurance benefits (ECF No. 17 at PageID.386). Specifically, Plaintiff asserts that Dr. Altman applied for and was approved to receive waiver of premium coverage on April 20, 2017, and the Plan "subsequently determined he had lost eligibility" when he submitted his medical documentation proving he was fit to return to work (*id.*). As to failure to exhaust administrative remedies, Plaintiff states that "Dr. Altman protested numerous times" to colleagues and Metro Health's administration, but Metro Health informed him that he had no ability to change either outcome, causing Dr. Altman to conclude that "further appeals or protests were futile" if available at all (*id.* at PageID.389). For these reasons, Plaintiff

10

argues that Defendants do not address "the proper theory of liability with respect to the waiver of premium coverage" as alleged in the Amended Complaint, and thus Plaintiffs' §§ 1332(a)(1)(B) and 1132(a)(3) claims are sufficient to survive a motion to dismiss (*id.* at PageID.390).

In reply, Defendants argue that because "the group life insurer, CIGNA, had sole fiduciary responsibility" for determining Dr. Altman's waiver of premium status, "[i]f that is Plaintiff's claim she has not sued the correct party" (ECF No. 20 at PageID.431).

The Court determines that, on the facts as alleged, dismissal of Plaintiff's claims at this time is not warranted for the reasons that follow.

a.    **Party Defendants**

The ERISA was enacted to "promote the interests of employees and their beneficiaries in employee benefit plans" and "protect contractually defined benefits[.]" *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (internal citations omitted).  The Act provides that when an administrator denies benefits, an employee participant may bring a civil action to recover benefits.  29 U.S.C. § 1132(a)(1)(B).  However, "[u]nless an employer is shown to control administration of a plan, it is not a proper party defendant in an action concerning benefits." *Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F.3d 833, 842 (6th Cir. 2007) (quotation and citation omitted).  Whether an employer-defendant is a plan administrator subject to suit under ERISA depends in part on whether the employer-defendant plays a "role in controlling or influencing" a plaintiff's benefits decision or is "vested with discretionary authority to determine [a participant's] eligibility for benefits" under the provisions of the Plan. *See Ciaramitaro v. Unum Life Ins. Co. of Am.*, 521 F. App'x 430, 438 (6th Cir. 2013) (unpublished); *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 438 (6th Cir. 2006) ("Under ERISA a person is a fiduciary only with respect to those aspects of the plan over which he or she exercises authority or control. When an insurance

company administers claims for employee welfare benefit plans and has authority to grant or deny claims, the insurance company is a 'fiduciary' for ERISA purposes. An employer who does not control or influence the decision to deny benefits is not the fiduciary with respect to denial of benefit claims.") (citations omitted).

According to the Plan Document and Summary Plan Description, Metro Health is identified as the "Plan Sponsor" (ECF No. 14-2 at PageID.314). The Plan Document sets forth under "Administration":

> Plan Sponsor is the plan administrator. The plan administrator is the designated named fiduciary and is charged with the administration of the Plan and has certain discretionary authority with respect to the administration of the Plan.

> With respect to the self-funded benefits, Plan Sponsor, as the plan administrator, has the ultimate discretion and authority to determine all questions of eligibility for participation and eligibility for payment of benefits, to determine the amount and manner of the payment of benefits and to otherwise construe and interpret the terms of the Plan. However, the plan administrator may delegate claims administration for some or all of the self-funded benefits to a third party administrator. Such a third party administrator may be named fiduciary for benefit appeals pursuant to the applicable benefit.

> The fully-insured benefits are provided pursuant to an insurance policy and the insurer has the ultimate discretion and authority to determine all questions of eligibility for participation and eligibility for payment of benefits, to determine the amount and manner of the payment of benefits and to otherwise construe and interpret the terms of the policy. The insurers are the exclusive source of payment for the fully-insured benefits.

(*id.* at PageID.353–354).

Here, while it may be true that CIGNA is the designated fiduciary for fully-insured benefits such as the waiver of premium coverage and life insurance benefits under the Plan at issue, at the dismissal stage, Plaintiff has sufficiently pleaded an action against the Plan and Metro Health. Specifically, Plaintiff alleges that the Plan had determined that Dr. Altman was no longer eligible for waiver of premium coverage benefits because he was ready to return to work based on a review

of his records by the Plan's medical staff, but that Metro Health's "inconsistent" determination that Dr. Altman undergo a competency evaluation prior to returning to work caused the delay in Dr. Altman's return to work date and alleged loss of benefits—and not any action or determination by CIGNA. Plaintiff further alleges that it was the Plan and Metro Health, not CIGNA, that communicated the above decisions to Dr. Altman (*see* Am. Compl. ¶¶ 28–29, 33, 35–38). Thus, at the dismissal stage, it is reasonable to infer from Plaintiff's allegations that the Plan had a role in determining Dr. Altman's eligibility for waiver of premium coverage benefits. Additionally, Plaintiff also alleges that it was Metro Health's requirement that Dr. Altman undergo a competency evaluation before returning to work—despite both Dr. Altman's physician's and the Plan's determination that he was fit and able to return to work—that resulted in a delay in Dr. Altman's return to work which caused Dr. Altman's ineligibility for and loss of group life insurance benefits. Therefore, at the dismissal stage, it is also reasonable to infer from Plaintiff's allegations that Metro Health had a role in controlling or influencing Dr. Altman's eligibility for benefits. *See, e.g., Harrison v. PNC Fin. Servs. Grp.*, 928 F. Supp. 2d 934, 943 (S.D. Ohio 2013) (finding, at dismissal stage, the plaintiff alleged "sufficient acts of administrative control" for plan administrator to continue as a defendant to the plaintiff's claim for recovery of benefits).

Accordingly, accepting the facts alleged by Plaintiff as true, dismissal of Counts I and III against either the Plan or employer Defendants at this stage would be premature.

### b. Application for Benefits and Failure to Exhaust Administrative Remedies

"[I]t is well settled that ERISA plan beneficiaries must exhaust administrative remedies prior to bringing a suit for recovery on an individual claim[.]" *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 717 (6th Cir. 2005) (citing *Constantino v. TRW, Inc.*, 13 F.3d 969, 974 (6th Cir.1994)). "Traditional exhaustion principles, however, include an exception for instances when

resort to the administrative route is futile or the remedy inadequate." *Costantino*, 13 F.3d at 974 (quotation omitted). "The standard for adjudging the futility of resorting to the administrative remedies provided by a plan is whether a clear and positive indication of futility can be made. … A plaintiff must show that it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 419 (6th Cir. 1998) (citations and quotation omitted).

In its discretion, the Court determines that Plaintiff has sufficiently pleaded that exhaustion of administrative remedies would have been futile. In short, Plaintiff plausibly alleges that Defendants' actions caused a delay in Dr. Altman's return-to-work date that interfered with Dr. Altman's "ability to receive rights to which he may have become entitled under the Plan as an active employee of the Defendants or to which Plaintiff may have become entitled under the Plan as a beneficiary of a participant" (Am. Compl. ¶ 98). As alleged by Plaintiff, the delay in Dr. Altman's return-to-work date due to the PACE Program evaluation, the timing of Metro Health's receipt of notice of Dr. Altman's passing results from the PACE Program, the date the Initial Employment Term could have or did commence as set forth in the 2018 Agreement, and the timing of Dr. Altman's rehospitalization allow the reasonable inference that any attempt by Plaintiff, a beneficiary, to exhaust administrative remedies would have been futile because it does not appear that Plaintiff could have applied for benefits nor pursued any administrative remedies prior to the instant litigation.

Accordingly, dismissal of Counts I and III is premature and Defendants' motion on this ground is properly denied.

### c.     Count III (29 U.S.C. § 1332(a)(3)

In the Sixth Circuit, "a plaintiff's § 1132(a)(3) claim of breach of fiduciary duty is merely a repackaged § 1 132(a)(1)(B) claim [if] the claims could have been brought under § 1132(a)(1)(B)." *Gore*, 477 F.3d at 842 (finding that the plaintiff was allowed to sue his plan administrator under § 1132(a)(1)(B), and his employer under § 1132(a)(3)). *See also Donati v. Ford Motor Co., Gen. Ret. Plan, Ret. Comm.*, 821 F.3d 667, 674 (6th Cir. 2016) (finding that the plaintiff's breach-of-fiduciary duty claim "impermissibly repackage[d] her wrongful-denial-of-benefits" claim contrary to *Gore* because the plaintiff's "claims [we]re against the same defendant for the same relief" and thus dismissal was proper).

Here, as stated in the Amended Complaint and as more fully set forth by Defendants, Plaintiff's Count I and III allege identical injury and seek identical relief against the same Defendant "fiduciaries" (ECF No. 14 at PageID.294-295). *Compare* Count I ("Plaintiff is entitled to life insurance benefits under the Plan") (Am. Compl. ¶ 94) *with* Count III, ("Plaintiff is entitled to equitable relief … requiring Defendant to pay … Plaintiff for all benefits to which they [sic] are retroactively entitled") (Am. Compl. ¶ 106).  Further, if Plaintiff succeeds on the merits of her denial of benefits claim under § 1132(a)(1)(B), that claim will provide an adequate and complete remedy for the injunctive or equitable relief sought in Count III such that dismissal of her § 1132(A)(3) claim is appropriate. *See Gore*, 477 F.3d 833 at 840; *see also Varity Corp v. Howe*, 516 U.S. 489, 515 (1996).

Therefore, Plaintiff's Count III is properly dismissed.

### 2.     Count IV – Michigan Persons With Disabilities Civil Rights Act (MPWDCRA)

Next, Defendants argue that Plaintiff fails to state a claim under the MPWDCRA because (1) Plaintiff fails to allege an actionable adverse employment action, and (2) Plaintiff fails to allege

facts to establish that Dr. Altman was "disabled" under the MPWDCRA (ECF No. 14 at PageID.296–302).

### a. Adverse Employment Action

First, Defendants argue that Plaintiff's allegation that he was discriminated against when Defendants did not "return him to work pending completion of a physical or mental examination that was not directly related to the requirements of Plaintiff's job" fails as a matter of law because Plaintiff signed and "agree[d] and acknowledge[d]" that his participation in the PACE evaluation was "'job-related and consistent with business necessity, including but not limited to patient safety'" in the 2018 Agreement (ECF No. 14 at PageID.296–297) (citing Am. Compl. ¶ 114; Ex. B to Am. Compl., ECF No. 13-2 at PageID.256). Thus, Defendants argue, contract law forecloses Plaintiff's allegations regarding Dr. Altman's "intent" and the 2018 Agreement expressly contradicts Plaintiff's allegation that the PACE evaluation was not related to the requirements of his job (*id.* at PageID. 297–301, 301 n.11) (citing *Gipson v. Tawas Police Authority,* 794 F. App'x 503, 504–08 (6th Cir. 2019)).

Plaintiff responds that Defendants' arguments rely on inferences not supported by the "undeveloped record" (ECF No. 17 at PageID.391).[2] Plaintiff contends Dr. Altman signed the agreement between June 1 and June 19, 2018 only after Metro Health had "informed him in no uncertain terms that his return to work was expressly conditioned upon his acquiescence" to the requirement of the fitness-for-duty test (*id.* at PageID.395–396). Plaintiff further argues that the question of whether the PACE Program evaluation was job-related or consistent with business

---

[2] Plaintiff argues in response that she is "not sure whether the 2018 Agreement was executed or not" and that the 2008 Agreement may control, potentially enabling Plaintiff to obtain relief from either contract (*id.* at PageID.392). However, in her Amended Complaint, Plaintiff concedes that the 2018 Agreement was executed by Dr. Altman at some point between June 1 and June 19, 2018 (Am. Compl. ¶ 55).

necessity is a question of law (*id.* at PageID.396). Specifically, Plaintiff argues that she has met her initial burden of establishing that Dr. Altman "'was an employee and that the employer required him to take a medical exam,' at which point in time the burden shifts to the employer" (*id.* at PageID.399) (quoting *Gipson*, 794 F. App'x at 505–06) to show evidence that "(1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others" (*id.*) (quoting *Kroll v. White Lake Ambulance Authority,* 763 F.3d 619, 623 (6th Cir. 2014)).

Plaintiff's arguments have merit.

MICH. COMP. LAWS § 37.1202 states that:

… [A]n employer shall not:

(a) Fail or refuse to hire, recruit … promote an individual because of a disability … that is unrelated to the individual's ability to perform the duties of a particular job or position.

(b) … [D]iscriminate against an individual with respect to compensation or the terms, conditions, or privilege of employment because of a disability … that is unrelated to the individual's ability to perform the duties of a particular job or position.

(c) Limit, segregate or classify an employee or applicant for employment in a way which deprives or tends to deprive an individual of employment opportunities or otherwise adversely affects the status of an employee because of disability … that is unrelated to the individual's ability to perform the duties of a particular job or position.

(d) Fail or refuse to hire, recruit, or promote an individual on the basis of physical or mental examinations that are not directly related to the requirements of the specific job.

(e) Discharge or take other discriminatory action against an individual on the basis of physical or mental examinations that are not directly related to the requirements of the specific job.

As to whether Dr. Altman agreed and acknowledged that the PACE evaluation was "'job-related and consistent with business necessity" by executing the 2018 Agreement, the Court

determines that Plaintiff has plausibly alleged facts indicating that Metro Health required Dr. Altman to undergo a mental examination prior to execution of the 2018 Agreement and in light of contrary determinations from Dr. Altman's physician and the Plan's review of Dr. Altman's medical records and case history. Plaintiff also alleges that, as of April 2018, Dr. Altman's illness and treatment did not affect his ability to perform the duties of his job. Thus, at the motion to dismiss stage, Defendants' arguments do not foreclose Plaintiff's claims.

### b. "Disability"

Second, Defendants assert that Plaintiff fails to allege the necessary facts to establish that Dr. Altman's leukemia is a disability as defined in the MPWDCRA (ECF No. 14 at PageID.301–302). Specifically, Defendants argue that Dr. Altman's leukemia was "directly related to his ability to perform the duties of his occupation" as evidenced by the 2018 Agreement where Dr. Altman acknowledged that the PACE Program evaluation was "job-related" and required by "business necessity" (*id.* at PageID.302).

In response, Plaintiff asserts that the Amended Complaint alleges that Dr. Altman's myelogenous leukemia "substantially affected many of his life activities, including his ability to perform his ordinary and customary activities of daily living" (ECF No. 17 at PageID.391). Plaintiff also contends that the 2018 Agreement was not executed until June 2018, and either the 2008 or 2018 Agreement "could have been active and pending at the time Dr. Altman attempted to return to work and passed away under [the Agreements'] durational terms" (*id.* at PageID.392–393).

Plaintiff's argument has merit.

The MPWDCRA requires a plaintiff to show that he is "disabled" within the meaning of the Act. *Peden v. City of Detroit*, 680 N.W.2d 857, 863 (Mich. 2004). The Act defines "disability" as:

> (i) A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:
>
> (A) … substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.

MICH. COMP. LAWS § 37.1103(d); *see Peden*, 680 N.W.2d at 863.

Here, Plaintiff has alleged that Dr. Altman was diagnosed with myelogenous leukemia, a "relatively uncommon form of blood-cell cancer which viciously attacks the bone marrow" that "substantially affected many of [Dr. Altman's] life activities," including, for a time, his ability to work, but that Dr. Altman's illness did not affect his ability to work as of April 2018 and prior to his leukemia's remission (Am. Compl. ¶¶ 21–22, 35–36). Plaintiff's claim is not foreclosed by the language in the 2018 Agreement that the PACE Program evaluation was "job-related" and "consistent with business necessity," because Plaintiff alleges that Dr. Altman attempted to return to work in April and May of 2018, and that Metro Health required Dr. Altman to undergo the competency evaluation in April and May of 2018, prior to executing the 2018 Agreement in June.[3] For instance, when the 2018 Agreement was executed is an issue of contract enforceability, and whether the PACE Program evaluation was in fact "job-related" is an issue of contract

---

[3] Plaintiff argues that she "cannot be sure" whether the 2018 Agreement was ever mutually executed by Dr. Altman and Metro Health (*see* ECF No. 17 at PageID.392–395). An unexecuted copy of the 2018 Agreement is attached to the Amended Complaint (ECF No. 13-2 at PageID.262). However, Plaintiff alleges that the 2018 Agreement was executed "during or around June of 2018, but not before June 19, 2018" (Am. Compl. ¶ 55).

interpretation, in light of the facts alleged by Plaintiff; for example, where Dr. Altman was determined fit to return to work by his treating physician and the Plan's medical review staff. Therefore, at the pleading stage, Plaintiff has plausibly alleged a disability under the MPWDCRA.

**3.**     **Count V – Breach of Contract**

Next, Defendants argue that Plaintiff's allegations that Defendants breached the 2018 Agreement "by (1) 'failing to properly register Dr. Altman for the PACE Program,' (2) 'failing to pay for services in the PACE Program,' and (3) 'otherwise failing to fulfill other obligations and conditions precedent for the commencement of the Employment Term'" fail to state a claim (ECF No. 14 at PageID.304) (citing Am. Compl. ¶ 122).   Specifically, Defendants allege that (1) they had no duty of performance to register Dr. Altman for the PACE program; (2) they did not fail to pay for services in the PACE program but at most caused a "two week 'delay' in payment"; and (3) Plaintiff's allegation regarding Defendants' failure to fulfill "obligations and conditions" prior to the Employment Term does not state any facts for a breach of contract claim (*id.* at PageID.304–305).

Plaintiff responds that, at the dismissal stage, her claim is plausible because the 2018 Agreement provided a two-step employment process (Sections 8 and 9) such that Dr. Altman's "Initial Employment Term" under the Agreement was to commence "on the first business day following successful completion of the Contingencies set forth in Paragraph 8" (ECF No. 17 at PageID.402).   According to Plaintiff, his return-to-work date was September 14, 2018, and Plaintiff and Dr. Altman were damaged by Metro Health's failure to advance Dr. Altman's employment status, "rendering him ineligible" for benefits he was entitled to at the commencement of the Initial Employment Term (*id.*).   Plaintiff also responds that Metro Health's failure to pay or

delay in paying for Dr. Altman's PACE evaluation was still a breach of contract not amenable to dismissal at this stage in the litigation (*id.* at PageID.403).

In reply, Defendants assert that "[e]ven if Dr. Altman had returned to work on September 14, 2018…," he would have been ineligible for all benefits under the Plan except medical/prescription drug benefits (ECF No. 20 at PageID.433) (citing Plan at 8). Defendants assert that Plaintiff does not allege "what provision(s) of the agreement Defendants breached, or how, or in what way Plaintiff incurred any damage" to survive a motion to dismiss (*id.*).

Defendants' arguments lack merit.

To state a breach of contract claim, a party must show "by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Constr., Inc.,* 495 Mich.161, 178 (2014).

Here, the 2018 Agreement shows that the "[h]ospital shall pay all program/evaluation costs" (Ex. B to Am. Compl. at 3, Sec. 8). Thus, at a minimum, Plaintiff plausibly alleges that Defendants may have breached their obligation to pay or breached by causing a delay that resulted in damages to Plaintiff (Am. Compl. ¶¶ 59–62). Further, despite Plaintiff's somewhat inconsistent statements as to Dr. Altman's return-to-work date, the 2018 Agreement provided that the Contingency Period ran through "the date Hospital receives notice of Physician's results from the PACE Program" (*id.* at 3–4, Sec. 8(b)), and that the "Initial Employment Term" starts the "first business day" following completion of the contingencies in section 8 (*id.* at 4, Sec. 9(a)). According to Plaintiff, Dr. Altman completed the contingencies on September 12, 2018, and was provided a report from the PACE Program on September 13, 2018, such that his Contingency Period would have ended and his Initial Employment Term could have commenced on September 14, 2018 (Am. Compl. ¶¶ 70–72). Plaintiff also alleges that Metro Health informed Dr. Altman of

his passing results of the PACE Program on September 17, 2018 and was considered fit for duty (*id.* ¶ 73).  Therefore, accepting the facts as alleged as true and drawing all reasonable inferences in Plaintiff's favor, the Court determines that Plaintiff has plausibly alleged a breach of the 2018 Agreement if Dr. Altman's Initial Employment Term was set to begin on or before September 17, 2018.

Accordingly, Defendants' motion as to Count V is properly denied.

**4.      Count II – 29 U.S.C. § 1140 ("§ 510" ERISA)**

Next, Defendants argue that Plaintiff cannot allege a *prima facie* claim for interference of Dr. Altman's benefits under 29 U.S.C. § 1140 (or "§ 510") (ECF No. 14 at PageID.306).  First, Defendants argue that  Plaintiff does not allege any facts showing Defendants had a "specific intent to violate ERISA" or interfere with Dr. Altman's "attainment of benefits under the Plan" (*id.*).  Next, Defendants assert that Plaintiff cannot show that Defendants engaged in "prohibited employer conduct" for the purpose of interfering with Dr. Altman's attainment of rights under the Plan because the PACE evaluation (and any delay of Dr. Altman's return-to-work date caused by the PACE evaluation) was contractually required (*id.* at PageID.306–307).

Plaintiff asserts that she has sufficiently pleaded a § 510 claim because "Metro Health subjected Dr. Altman to an adverse action (i.e. failure to return him to work in a timely and lawful fashion) for the purpose of interfering with Dr. Altman's right to obtain certain welfare benefits which Metro Health was required to provide to him under the terms of either the 2008 Agreement or the 2018 Agreement including (but not limited to) a generous group life insurance policy" (ECF No. 17 at PageID.404–405).

In reply, Defendants argue that "the timing of events" alone does not support an inference that Defendants "had a specific intent to deprive Dr. Altman of benefits" (ECF No. 20 at PageID.435).

Plaintiff has sufficiently pleaded a claim for interference of benefits.

29 U.S.C. §1140 ("§510") provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan … or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. … The provisions of section 1132 … shall be applicable in the enforcement of this section.

Thus, § 510 prohibits an employer from taking adverse employment actions against an employee "for the purpose of interfering with the attainment of any right to which such participant may become entitled to under the plan[.]"  The elements of a § 510 claim require the plaintiff to demonstrate that "(1) he was engaged in an activity that ERISA protects; (2) he suffered an adverse employment action; and (3) a causal link exists between his protected activity and the employer's adverse action."  *Williams v. Graphic Packaging Int'l, Inc.*, 790 F. App'x 745, 754–55 (6th Cir. 2019) (internal quotations omitted).  "[T]he Sixth Circuit has recognized two different kinds of claims under [ERISA § 510]: (1) a retaliation claim where adverse action is taken because a participant availed [him]self of an ERISA right; and (2) an interference claim where an adverse action is taken as interference with the attainment of a right under ERISA."  *Id.* at 755.

Here, Plaintiff alleges an interference claim, and has stated sufficient facts that, if accepted as true, plausibly allege that Dr. Altman suffered an adverse employment action (Defendants alleged interference with the attainment of insurance or waiver of coverage benefits) and that a causal connection between the protected activity and adverse action (the delay from April to

September 2018 in payment and approval of Dr. Altman's participation and completion of the PACE Program).

Accordingly, Defendants' motion as to Plaintiff's Count II is properly denied.

**5.     Arbitration**

Last, in the alternative to dismissal, Defendants argue that paragraph 31 of the 2018 Agreement that is the basis of the instant lawsuit requires the parties to arbitrate Plaintiff's claims (ECF No. 14 at PageID.307) (citing Ex. B to Am. Compl. at 9, Sec. 31). Defendants move to compel arbitration and stay the proceedings until arbitration is complete, arguing that Plaintiff's breach of contract claim "is squarely within the arbitration clause" of the 2018 Agreement and that Plaintiffs' other claims are "within the scope of the arbitration clause" because they relate to the 2018 Agreement's requirement for Dr. Altman to receive a PACE evaluation before returning to work (*id.* at PageID.308).

Plaintiff did not respond to Defendants' argument.

Here, the 2018 Employment Agreement provides that:

Any controversy, dispute or claim arising out of or relating to this Agreement, or the breach of the Agreement, shall be settled in accordance with the then existing American Arbitration Association Employment Rules. Judgment on any arbitration award may be entered in any court having jurisdiction. The Hospital and the Physicians shall equally pay the arbitration fees and expenses.

(Ex. B to Am. Compl. [ECF No. 13-2] at 9, Sec. 31).

The Federal Arbitration Act (FAA) provides that arbitration clauses in commercial contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. If a court determines that the cause of action is covered by an arbitration clause, it must stay the proceedings until the arbitration process

is complete.  9 U.S.C. § 3.  "Under the statute, a district court must make a number of threshold

determinations before compelling arbitration:

> When considering a motion to stay proceedings and compel arbitration under the
> Act, a court has four tasks: first, it must determine whether the parties agreed to
> arbitrate; second, it must determine the scope of that agreement; third, if federal
> statutory claims are asserted, it must consider whether Congress intended those
> claims to be nonarbitrable; and fourth, if the court concludes that some, but not all,
> of the claims in the action are subject to arbitration, it must determine whether to
> stay the remainder of the proceedings pending arbitration."

*Fazio v. Lehman Bros.*, 340 F.3d 386, 392 (6th Cir. 2003) (quoting *Stout v. J.D. Byrider,* 228 F.3d

709, 714 (6th Cir.2000)); *see also Javitch v. First Union Securities, Inc.*, 315 F.3d 619, 624 (6th

Cir.2003) ("Before compelling an unwilling party to arbitrate, the court must engage in a limited

review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate

exists between the parties.").  "State contract law … governs in determining whether the arbitration

clause itself was validly obtained, provided the contract law applied is general and not specific to

arbitration clauses."  *Fazio*, 340 F.3d at 392–93.  In *Hawkins v. Cintas Corp.*, 32 F.4th 625, 629

(6th Cir. 2022), the Sixth Circuit recently addressed the third determination, where ERISA

statutory claims are asserted, and stated:

> The burden of proving that the claims are unsuited to arbitration rests with the party
> seeking to prevent arbitration. *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S.
> 79, 91[] (2000). Still, that policy must be balanced with "ERISA's policy … to
> provide 'ready access to the Federal courts.'" *Smith v. Aegon Cos. Pension Plan*,
> 769 F.3d 922, 931 (6th Cir. 2014) (quoting 29 U.S.C. § 1001(b)).

> This court has not yet determined whether statutory ERISA claims are subject to
> arbitration. But "every other circuit to consider the issue" has held that "ERISA
> claims are generally arbitrable." *See Smith v. Bd. of Dirs. of Triad Mfg., Inc.*, 13
> F.4th 613, 620 (7th Cir. 2021).

Without the benefit of full briefing from the parties or a hearing, the Court is unable to

conduct a limited review into the validity and enforceability of the 2018 Agreement's arbitration

provision, and specifically whether Plaintiff's statutory ERISA or MPWDCRA claims are subject

to arbitration as "relating to" the 2018 Agreement or must be stayed. *See Fazio*, 340 F.3d at 392 ("[T]o compel arbitration, a court must conduct a hearing," and "'upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. …'") (quoting 9 U.S.C. § 4). As such, the Court denies Defendants' motion in the alternative without prejudice to refiling.

### III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (ECF No. 14) is GRANTED in part and DENIED in part; specifically, Plaintiff's Count III is dismissed. The case proceeds on Plaintiff's Counts I, II, IV, and V.

**IT IS FURTHER ORDERED** that Defendants shall file an Answer to Plaintiff's Amended Complaint not later than 14 days after entry of this Opinion and Order.


Dated:  December  30, 2022                    /s/ Jane M. Beckering
                                            JANE M. BECKERING
                                            United States District Judge